1   COLEMAN & BALOGH LLP
    ETHAN A. BALOGH, No. 172224
2   JAY A. NELSON, No. 258431
    235 Montgomery Street, Suite 1070
3   San Francisco, CA 94104
    Telephone: 415.391.0440
4   Facsimile: 415.373.3901
    eab@colemanbalogh.com
5   jay@colemanbalogh.com

6   Attorneys for Defendant
    JOHN THAT LUONG
7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                   SAN FRANCISCO DIVISION

11
    UNITED STATES OF AMERICA,          Case No. 96 Cr. 94 (JSW)
12
              Plaintiff,               JOHN THAT LUONG'S AMENDED
13                                     MEMORANDUM OF POINTS AND
         v.                            AUTHORITIES IN SUPPORT OF MOTION
14                                     PURSUANT TO 28 U.S.C. § 2255
    JOHN THAT LUONG,
15
              Defendant.               Before the Honorable Jeffrey S. White
16                                     United States District Judge

17                                     **EVIDENTIARY HEARING REQUESTED**

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT..................................................................................1

BACKGROUND......................................................................................................1

CLAIMS I & III..................................................................................................2

    A.    Legal standards...................................................................................2

    B.    Analysis...............................................................................................3

CLAIM IX..........................................................................................................5

    A.    Background.........................................................................................6

        1.    The Government's wiretap application..............................6

        2.    The Government disavowed knowledge that Ah Muoi was a cooperating source...........................................................8

        3.    Newly-discovered evidence strongly supports Mr. Luong's contention that Ah Muoi has received consideration from the Government...................................................................10

        4.    The Court should, at a minimum, order discovery regarding Ah Muoi's relationship with the United States....................12

CLAIM XI.........................................................................................................13

    A.    Background.........................................................................................13

    B.    Newly-discovered evidence demonstrates that Mr. Luong is actually innocent of the Aristocrat robbery, and this Court should thus vacate Mr. Luong's convictions on Counts 13-15, and resentence him accordingly...........................................................................................16

        1.    Reth has exonerated Mr. Luong of the Aristocrat robbery...........17

    C.    Trial counsel rendered ineffective assistance by failing to call Reth to exonerate Mr. Luong on the Aristocrat counts...........................................18

i

CLAIM XII...........................................................................................................20

    A.     Background.............................................................................................21

    B.     Trial counsel rendered ineffective assistance by failing to object to the use of the word "caused" in the robbery instructions.......................................22

CLAIM XIII.........................................................................................................25

    A.     Background.............................................................................................25

    B.     There is a reasonable probability of a different result had Mr. Luong's trial and appellate counsel raised his claim for relief under 18 U.S.C. § 924(o)....................................................................................................26

    C.     There is a reasonable probability of a different result had Mr. Luong's trial and appellate counsel raised his claim for relief that no more than one sentence pursuant to section 924(c) could have been imposed upon him because the superseding indictment failed to charge any of the section 924(c) violations as "second or subsequent" offenses..............................34

    D.     The Court should find Mr. Luong's sentence unlawful because the jury found a single, overarching Hobbs Act conspiracy, and multiple section 924(c) convictions cannot be tied to a single underlying crime.................35

        1.     Background....................................................................................35

        2.     Argument.......................................................................................36

CONCLUSION.....................................................................................................39

# TABLE OF AUTHORITIES

**CASES**

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003).........................................................18

*Bailey v. United States*, 516 U.S. 137 (1995).................................................................26

*Brady v. Maryland*, 373 U.S. 83 (1963)........................................................................12

*Braverman v. United States*, 317 U.S. 49 (1942)........................................................36,37

*Busic v. United States*, 446 U.S. 398 (1980)...................................................................26

*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) (*en banc*).......................................17

*Deal v. United States*, 508 U.S. 129 (1993)..........................................................32,34,35

*Dean v. United States*, 556 U.S. 558 (2009)...................................................................29

*Duren v. Missouri*, 439 U.S. 357 (1979).........................................................................3

*Franks v. Delaware*, 438 U.S. 154 (1978)................................................................5,8,12

*Pinkerton v. United States*, 328 U.S. 640 (1946)........................................................21,27

*Strickland v. Washington*, 466 U.S. 668 (1984)...................................................3,18,20,22

*Taylor v. Louisiana*, 419 U.S. 522 (1975).......................................................................2

*United States v. Alaniz*, 235 F.3d 386 (8th Cir. 2000)...................................................28

*United States v. Anderson*, 59 F.3d 1323 (D.C. Cir. 1995) (*en banc*)......................37,38

*United States v. Andrews*, 75 F.3d 552 (9th Cir. 1996).................................................32

*United States v. Baker*, 658 F.3d 1050 (9th Cir. 2011)..................................................19

*United States v. Booker*, 543 U.S. 220 (2005)...............................................................25

*United States v. Bonallo*, 858 F.2d 1427 (9th Cir. 1988)...............................................30

*United States v. Broce*, 488 U.S. 563 (1989)..................................................................36

iii

*United States v. Castillo-Felix*, 539 F.2d 9 (9th Cir. 1976)..........................................................27

*United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008).......................................................12

*United States v. Fontanilla*, 849 F.2d 1257 (9th Cir. 1988)...............................................32,38

*United States v. Foreman*, 914 F. Supp. 385 (C.D. Cal. 1996)...............................................26

*United States v. Haeng Hwa Lee,* 602 F.3d 974 (9th Cir. 2010)...........................................23

*United States v. Hungerford*, 465 F.3d 1113 (9th Cir. 2006)..................................................33

*United States v. Hutcheson*, 312 U.S. 219 (1941)....................................................................31

*United States v. King*, 687 F.3d 1189 (9th Cir. 2012) *(en banc)*.......................................19

*United States v. Luong*, 215 Fed. Appx. 639 (9th Cir. 2006)............................................*passim*

*United States v. Luong*, 627 F.3d 1306 (9th Cir. 2010)........................................................2,36

*United States v. Main*, 28 F. Supp. 550 (S.D. Tex. 1939)......................................................32

*United States v. O'Brien*, 542 F.3d 921 (1st Cir. 2008).........................................................35

*United States v. Redcorn*, 528 F.3d 727 (10th Cir. 2008)......................................................32

*United States v. Rodriguez-Gonzales*, 358 F.3d 1156 (9th Cir. 2004)...............................34,35

*United States v. Washington*, 301 F. Supp. 2d 1306 (M.D. Ala. 2004)..............................32,33

*United States v. Wegg*, 919 F. Supp. 898 (E.D. Va. 1996)..................................................29,30

*United States v. Williams*, 558 F.3d 166 (2d Cir. 2009)......................................................28,29

*United States v. Wills*, 88 F.3d 704 (9th Cir. 1996)................................................................38

*United States v. Wuco*, 535 F.2d 1200 (9th Cir. 1976)..........................................................30

*United States v. Zhou*, 428 F.3d 361 (2d Cir. 2005)...............................................................33

*Vasquez v. Hillery*, 474 U.S. 254 (1986)...................................................................................2

*Williams v. United States*, 168 U.S. 382 (1897).....................................................................31

*Ziegler v. American Maize-Products Co.*, 658 A.2d 219 (Me. 1995)...........................................27

**CONSTITUTIONAL PROVISIONS**

U.S. Const., amend IV........................................................................................13

U.S. Const., amend V.....................................................................................12,13

U.S. Const, amend VI........................................................................................2,3

**STATUTES**

18 U.S.C. § 2...............................................................................................21,23

18 U.S.C. § 924.........................................................................................*passim*

18 U.S.C. § 1951.......................................................................................21,22,24

28 U.S.C. § 1861.................................................................................................2

28 U.S.C. § 1867.................................................................................................2

28 U.S.C. § 2255.............................................................................................1,2

**RULES**

Fed. R. Crim. P. 7.......................................................................................30,31,32

Fed. R. Crim. P. 29....................................................................................16,18,36

Section 2255 Rule 6........................................................................................1,5

Section 2255 Rule 8............................................................................................1

**OTHER**

Model Penal Code § 5.03(3)..............................................................................37

Ninth Cir. Model Crim. Instr. 8.31.1 (1997 ed.)...................................................22

Ninth Cir. Model Crim. Instr. 8.117 (2000 ed.)...................................................22

v

**PRELIMINARY STATEMENT**

Defendant John That Luong, by and through his counsel, respectfully submits this Amended Memorandum of Points and Authorities in support of his motion pursuant to 28 U.S.C. § 2255. *See* Dkt. 2058. Prior to undersigned counsel's appointment in this matter, Mr. Luong filed a *pro se* section 2255 motion in which he raised 13 claims for relief. *Id.* Mr. Luong then filed a *pro se* memorandum of points and authorities in support of his motion. Dkt. 2082. By this Amended Memorandum, counsel seeks to clarify and expand upon certain of Mr. Luong's claims, and—with Mr. Luong's consent—withdraw others.

Specifically, Mr. Luong withdraws the following claims for relief: Claims II, IV, V, VI, VII, VIII, and X. *See id.*, Attachment C. In the pages that follow, Mr. Luong presents argument in support of his remaining claims—*viz.*, Claims I, III, IX, XI, XII, and XIII—and asks the Court to grant him relief on the grounds stated. In addition, Mr. Luong asks the Court to grant him discovery in support of his section 2255 motion, and to grant him an evidentiary hearing. *See* Section 2255 Rules 6, 8.

**BACKGROUND**

On March 24, 1998, John That Luong was charged in a 21-count superseding indictment before the Honorable Marilyn Hall Patel. Dkt. 471. The counts alleged against Mr. Luong included substantive RICO (Count One), RICO conspiracy (Count Two), Hobbs Act conspiracy (Counts 10 and 13), Hobbs Act robbery (Counts 11 and 14), use of a firearm during and in relation to a crime of violence (Counts 12 and 15), conspiracy to distribute heroin (Count 16), heroin distribution (Counts 17 and 18), and a phone count (Count 19). *Id.* In short, the Government alleged that Mr. Luong was one of several leaders of a racketeering enterprise engaged in armed robberies of computer chip companies, and that Mr. Luong also engaged in heroin distribution. *See id.*

The case involved considerable pretrial litigation, including, *inter alia*, defense motions to suppress wiretap evidence and to disclose confidential informants. *See generally* Case No. 96 Cr. 94, Docket Report. Mr. Luong commenced jury trial on February 8, 2000. Dkt. 1124. Approximately four months later, the jury returned guilty verdicts on most counts, but entered

1    acquittals on Count 18 and Racketeering Act 14, which alleged Mr. Luong's involvement in a

2    December 27, 1995 heroin transaction.  Dkt. 1260.

3        On direct appeal, the Ninth Circuit affirmed Mr. Luong's convictions, but remanded for

4    resentencing.  *United States v. Luong*, 215 Fed. Appx. 639 (9th Cir. 2006).  Upon remand, Judge

5    Patel resentenced Mr. Luong to 65 years in custody, and the Ninth Circuit affirmed.  *United*

6    *States v. Luong*, 627 F.3d 1306 (9th Cir. 2010).  These section 2255 proceedings followed.

7                                    **ARGUMENT**

8    **CLAIMS I & III**

9        In Claims I and III, Mr. Luong contends on information and belief that trial counsel

10   rendered constitutionally ineffective assistance by failing to challenge the Northern District of

11   California's grand and petit jury selection procedures, *See* Dkt. 2058, Attachment C.

12       **A.    Legal standards.**

13       Discrimination in the selection of grand jurors violates a defendant's right to equal

14   protection of law.  *See Vasquez v. Hillery*, 474 U.S. 254, 260-61 (1986) (collecting cases).  The

15   Sixth Amendment similarly requires that "petit juries must be drawn from a source fairly

16   representative of the community[.]"  *Taylor v. Louisiana*, 419 U.S. 522, 702 (1975).

17       Congress has codified these principles in the Jury Selection and Service Act, which

18   provides that "all litigants in Federal courts entitled to trial by jury shall have the right to grand

19   and petit juries selected at random from a fair cross section of the community in the district or

20   division wherein the court convenes."  28 U.S.C. § 1861.  Further, "[i]n criminal cases, before

21   the voir dire examination begins, or within seven days after the defendant discovered or could

22   have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the

23   defendant may move to dismiss the indictment or stay the proceedings against him on the ground

24   of substantial failure to comply with the provisions of this title in selecting the grand or petit

25   jury."  28 U.S.C. § 1867(a).  To establish a prima facie violation of the "fair cross section"

26   requirement, a defendant must show:

27            (1) that the group alleged to be excluded is a 'distinctive' group in the
             community; (2) that the representation of this group in venires from which
28           juries are selected is not fair and reasonable in relation to the number of

                                         2

such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Criminal defendants also enjoy a Sixth Amendment right to the effective assistance of counsel. To establish ineffective assistance of counsel, a defendant must demonstrate (1) that "counsel's representation fell below an objective standard of reasonableness[,]" and (2) a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

**B.  Analysis.**

Mr. Luong contends on information and belief that the Northern District's 1998 grand jury and 2000 trial jury selection procedures violated the principles articulated above, particularly in light of the considerable demographic shifts that took place in the Bay Area between 1990 and 2000. He further contends that his trial counsel provided ineffective assistance of counsel by failing to obtain, review and marshal evidence from readily available court data that could have substantiated these claims and resulted in dismissal of the indictment based on the flawed grand jury procedures and/or the institution of remedial measures to guarantee his petit jury met the Sixth Amendment standard.

To begin, trial counsel made no efforts to evaluate the propriety of the procedures regarding the selection of the grand jurors that returned the operative indictment or regarding the procedures by which the petit jury would be selected. There is no basis for this lapse. Upon a proper motion, and as have been filed in other matters—*see United States v. Rausini*, No. 95 Cr. 319 (SI), Dkt. 644-45; *United States v. Cerna*, No. 08 Cr. 730 (WHA), Dkt. 523; *United States v. Ortiz*, No. 12 Cr. 119 (SI), Dkt. 437-39; *United States v. Milburn, et al.*, No. 05 Cr. 167 (WHA), Dkt. 399-402, 420—trial counsel could (and should) have obtained, for example: blank copies of jury questionnaires; letters of instructions to prospective grand and petit jurors; JS-12 forms for the master and qualified jury wheel for the grand jury that issued the operative indictment, and for the potential petit jury pool; the manual of procedures that the Clerk uses to compile the master and qualified jury wheels; documents reflecting procedures used to select

3

names from the master or qualified jury wheels, and to excuse prospective grand and petit jurors

for hardship or other reasons, including but not limited to documentation relating to any policies

and procedures used to determine a prospective juror's ability to serve; statistical information

compiled by the jury clerk relating to the makeup of the jury pool from which the grand jury was

drawn that returned the operative indictment, and the same information for the jury pool from

which any potential petit jury would be drawn for trial; jury lists of the qualified jury wheel from

which was drawn the grand jury that indicted Mr. Luong, as well as the same for the qualified

jury wheel from which any petit juries would be selected at trial; and a declaration from the jury

clerk describing the procedures used to compose grand jury lists.  *See*, *e.g.*, *Cerna*, No. 08 Cr.

730 (WHA), Dkt. 633; *Ortiz*, No. 12 Cr. 119 (SI), Dkt. 554; *Rausini*, No. 95-319 (SI), Dkt. 619.

Mr. Luong contends, on information and belief, that had trial counsel taken these steps, he likely

would have uncovered information sufficient to sustain his Sixth Amendment challenge.

Moreover, in light of the Bay Area's evolving demographics during the late 1990s, trial

counsel should have further focused on addressing these important Sixth Amendment issues.

For example, census data reflect that the Bay Area's "White" population dropped

dramatically—from 68.9% to 58.1%—between the 1990 census and the 2000 census.  *Compare*

Declaration of Ethan A. Balogh Filed November 27, 2013 ("Balogh Decl.") Ex. A *with id.* Ex. B.

So too, the region's Asian population rose from 15.3% to 19.0% during the same period, and the

Hispanic population rose from 14.9% to 19.4%.  *See id.*  Accordingly, Mr. Luong contends that

the Northern District's 1998 and 2000 jury selection procedures likely failed to account for these

demographic shifts, thus giving rise to violations of the constitutional and statutory rights

identified above.  So too, because the 2000 census issued on April 1, 2000—*i.e.*, in the middle of

Mr. Luong's trial[1]—Mr. Luong contends that trial counsel rendered further ineffective assistance

by failing to seek dismissal and/or a stay under section 1867(a) in light of the 2000 census data.

As the Court is aware, however, the relevant materials explaining the District's jury

selection procedures consist, in large part, of internal administrative documents unavailable to

---

[1] *See* http://www.census.gov/main/www/cen2000.html.

1   the public absent Order of the Court.  *See also* Balogh Decl. ¶ 4.  Accordingly, at present, Mr.

2   Luong lacks sufficient documentation to substantiate fully these claims for relief.  Mr. Luong

3   thus respectfully asks the Court, as set forth in his concurrently-filed Motion for Discovery, to

4   permit him to acquire the materials identified therein, in order that he may conduct a full and

5   complete assessment of these claims before presenting any additional argument, as appropriate.

6   **CLAIM IX**

7        In Claim IX, Mr. Luong alleged *pro se* that trial counsel rendered constitutionally

8   ineffective assistance by failing to object to Government misconduct; his supporting authorities

9   focused on the Government's handling of cooperating co-defendant Chhayarith ("Charlie") Reth.

10  *See* Dkt. 2058, Attachment C; Dkt. 2082 ¶¶ 7(h)-(i).  With the assistance of undersigned counsel,

11  Mr. Luong now presents further argument regarding Reth in connection with Claim XI, *infra*,

12  and supplements his Government misconduct claim on activity relating to suspected Government

13  informant Tuan Thanh Nguyen, a.k.a. "Ah Muoi."[2]

14       In short, Mr. Luong contends that (a) newly-discovered evidence strongly supports his

15  view—which Judge Patel rejected pretrial—that Ah Muoi served and/or continues to serve as an

16  undisclosed Government informant; (b) the Government's suppression of Ah Muoi's status as an

17  informant violates Mr. Luong's right to due process of law; (c) in light of Mr. Luong's newly-

18  discovered evidence implicating Ah Muoi as a confidential source, this Court should revisit

19  Judge Patel's orders with respect to (i) Mr. Luong's motions to suppress wiretap evidence for

20  lack of necessity, and for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), and (ii) for

21  the disclosure of confidential informants; and (d) at a minimum, grant Mr. Luong discovery

22  pursuant to Section 2255 Rule 6, so that he may obtain additional information regarding the

23  nature of Ah Muoi's relationship with the United States.

24  ////

25  ////

26

27

28       [2]Unless otherwise noted, Mr. Luong refers to Tuan Thanh Nguyen as "Ah Muoi," given
    the large number of individuals named "Nguyen" in this case.  *See*, *e.g.*, Dkt. 471.

1

**A.    Background.**

2

**1.    The Government's wiretap application.**

3

This was a wiretap case, beginning with an August 1, 1995 wiretap application granted by

4

the Honorable Thelton Henderson.  *See* Balogh Decl. Ex. C.  The supporting affidavit was

5

executed by FBI Special Agent Carol Lee.  *Id.*

6

In her affidavit, Lee declared that she had probable cause to believe that Mr. Luong and

7

three other individuals—including Ah Muoi—were engaged, *inter alia*, in the unlawful

8

distribution of heroin.  *Id.* at 4-5.[3]  Lee identified Mr. Luong and Ah Muoi as subjects of the

9

investigation, and provided identifying information regarding both men, including physical

10

characteristics, dates of birth, drivers license numbers, and arrest histories.  *Id.* at 9-11.

11

Lee also identified seven confidential sources ("CS") employed by the Government in its

12

investigation, each of whom she described as "accurate[,]" "reliable[,]" and/or as people whose

13

information had been verified by the agents.  *See id.* at 12-20.  Importantly, many of the

14

informants described a close relationship between Mr. Luong and Ah Muoi.  For example, CS-3

15

referred to Ah Muoi as Mr. Luong's "right hand man[,]" and indeed, the person who

16

"insulate[d]" Mr. Luong "from the lower level street crime, and from the risk of prosecution."

17

*Id.* at 14.  Similarly, CS-6 described Ah Muoi as Mr. Luong's "closest associate[,]" and noted

18

that he had moved from Boston to California in March 1995.  *Id.* at 17.  Finally, CS-2 identified

19

Ah Muoi as Mr Luong's "associate[]" in Boston, and CS-7 identified Ah Muoi as Mr. Luong's

20

"associate[]" in San Francisco.  *Id.* at 12, 19.[4]

21

Lee also provided a lengthy description of the Government's investigation into Mr.

22

Luong, *see id.* at 20-54, in which she disclosed a number of suspected illegal acts committed by

23

_____

24

[3]For ease of reference, Mr. Luong refers to the page numbers assigned by Lee at the time
she submitted the affidavit, rather than the Bates numbers later assigned by the United States in

25

discovery.

26

[4]Further, at trial, the Government's cooperating witnesses testified that Ah Muoi was not

27

only Mr. Luong's "right hand man," but in fact, was one of the"Big Brothers" of Mr. Luong's
purported organization—*i.e.*, that Ah Muoi himself one of the few top-level leaders. *See*, *e.g.*,

28

Trial RT 1798-1803, 6054.

Mr. Luong, many of which also involved Ah Muoi. *See*, *e.g.*, *id.* at 24 ("LUONG and AH MUOI travelled [sic] frequently between Boston, Philadelphia and San Francisco."); *id.* at 26 (alleging that Ah Muoi was arrested in Boston with Mr. Luong's pager in August 1994, and that he drove Mr. Luong to an alleged counterfeit currency deal involving CS-4); *id.* at 27-28 (alleging that CS-4 bought heroin from Ah Muoi in Mr. Luong's absence, and that Mr. Luong warned CS-4 about Ah Muoi's arrest in Boston, and also describing the circumstances of Ah Muoi's ensuing prosecution by Boston authorities); *id.* at 47-52 (describing toll records of calls between Mr. Luong's suspected telephone numbers and a number associated with Ah Muoi).

Despite her detailed recitation of these investigative successes, Lee declared that a wiretap was necessary, *inter alia*, to identify (a) the telephones Mr. Luong allegedly used in connection with heroin transactions; (b) other co-conspirators, including the source(s) of heroin; (c) the dates, times, and places of heroin shipments; (d) the communication facilities used for controlled substance activities; (e) the pager codes employed by the co-conspirators to identify themselves and drug quantities and prices; (e) locations where drugs were stored; (f) assets acquired with drug proceeds; and (g) "the precise nature and scope of the illegal activities." *Id.* at 54-55.

Lee also explained why, in her view, traditional investigative techniques were insufficient to meet those goals. As pertinent here, Lee declared that confidential sources were inadequate because "unless an informant has been taken into the complete confidence of the subjects, the informant is unlikely to learn the full scope of the violators' activities[,]" and in her view, the confidential sources in this case failed to meet that high bar. *See id.* at 56 ("LUONG has never taken CS-7 into his confidence"); *id.* (CS-3 "never learned of the identity of LUONG's heroin supplier(s)"); *id.* (CS-1, CS-2, CS-4, CS-5, and CS-6 "have never made contact with any of the other upper-level subjects of this investigation"). Lee also declared that Government attempts to introduce undercover agents had not met with success. *Id.* at 56-57.

More directly, Lee expressed concern that "[a]t the present time, there are no sources known to your affiant, with the exception of CS-7 and CS-3, who have knowledge of the activities of the upper-level members of this conspiracy." *Id.* at 57. *See also id.* ("None of the

other sources have been able to penetrate this organization to any significant degree, and certainly not enough to develop a significant prosecutable case against the mid or upper level members of this group.").  Lee thus concluded that she lacked a confidential source who had access to the "full scope" of the suspected activities, including anyone who had the "complete confidence" of the "upper level members" sufficient to "satisfy the goals of this investigation." *Id.* at 58-59.

### 2.   The Government disavowed knowledge that Ah Muoi was a cooperating source.

The defendants filed numerous pretrial motions to suppress the fruits of the Government's electronic surveillance, arguing, *inter alia*, that the Government failed to establish necessity for a wiretap under Title III, and requesting a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).  *See*, *e.g.*, Dkt. 357, 789-91, 794, 800.  Judge Patel rejected the necessity arguments, relying heavily on Agent Lee's representations regarding the limitations of the confidential sources.  Dkt. 424, 882.

In connection with his motions, Mr. Luong identified an unusual circumstance suggesting that Ah Muoi—notwithstanding the fact that he was identified in the affidavit as a target of the investigation—was, in fact, an undisclosed confidential source during the relevant time frame. *See*, *e.g.*, Dkt. 790, 817-18, 822.  Specifically, as noted above, Ah Muoi was arrested in 1994, and charged with heroin distribution in the District of Massachusetts.  *See* D. Mass Case No. 94 Cr. 10220 (EFH).[5]  Ah Muoi proceeded to trial, and on January 27, 1995, the district court granted him a judgment of acquittal under Fed. R. Crim. P. 29.  *See id.*, Dkt. 70.

Shortly thereafter, Ah Muoi was subpoenaed to testify before a federal grand jury.  *See* Declaration of Donald Criswell Filed November 27, 2013 ("Criswell Decl.") ¶ 5.  According to Ah Muoi's attorney, he accompanied Ah Muoi to the grand jury proceeding and advised Ah Muoi to invoke his Fifth Amendment privilege against self-incrimination.  *Id.*  After Ah Muoi

---

[5]As discussed below, Ah Muoi gave the false name "Quang Phan" in connection with the Boston prosecution.  *See* D. Mass Case No. 94 Cr. 10220 (EFH).  There is no dispute that "Quang Phan," Tuan Thanh Nguyen, and Ah Muoi are the same person.

entered the grand jury room, however, the attorney sat outside waiting for hours, eventually left, and never saw Ah Muoi again.  *See id.*  Based on these (and other) circumstances, Mr. Luong argued that (a) Ah Muoi's disappearance from the grand jury room in early 1995 gave rise to an inference that Ah Muoi was working for the Government prior to the issuance of the August 1995 wiretap, and (b) if so, his undisclosed cooperation with the United States undermined the Government's necessity showing, given the Government's own evidence showing a close relationship between Ah Muoi and Mr. Luong—*i.e.*, precisely the type of intimate "confidence" that Agent Lee declared was lacking with respect to the other confidential sources.  *See* Dkt. 818.

In response, the Government did not dispute that Ah Muoi "disappeared shortly after giving grand jury testimony in Boston," Dkt. 826, nor that Ah Muoi was, in fact, an informant. *See id.*; *see also* Dkt. 814.  Instead, the Government challenged Mr. Luong's bases for suspecting that Ah Muoi was a confidential source, arguing, *inter alia*, that (a) Ah Muoi did not, in fact, receive preferential treatment from the Government, because although he escaped prosecution in this case, he *was* charged in a related Hobbs Act and firearm case filed in the Central District of California, and (b) Ah Muoi may have disappeared from Boston *not* because he was assisting the Government, but instead, because he purportedly stole $700,000 from the defendants, and thus disappeared for his own safety.  *See* Dkt. 814, 826.

At a hearing on the matter, the AUSA in charge of the Central District prosecution represented that Ah Muoi was "a fugitive and he is not an informant.  We would be happy to get our hands on him."  June 29, 1999 RT at 121.  Government counsel from the Northern District jokingly observed that based on his disappearance from the grand jury room, Ah Muoi "must have morphed[,]" *id.* but reiterated that Ah Muoi was not an informant "that [she knew] of," and moreover, that she had "made inquiries back to Boston" on the matter.  *Id.* at 123.  The Northern District AUSA also conceded that her "realm of information is not the universe," however, and Judge Patel (correctly) noted that the knowledge of other Government officials was "imputed" to her.  *Id.* at 124.  Finally, Government counsel informed the Court that she expected to receive a

////

////

9

1  copy of Ah Muoi's grand jury testimony from the Boston office, and Judge Patel directed her to

2  provide the transcript *in camera* "unless I indicate otherwise[.]" *Id.* at 125-26.[6]

3      In a written Order, Judge Patel "question[ed]"—but did not decide—whether it would

4  materially affect the necessity analysis if, in fact, Ah Muoi was a Government source. Dkt. 882

5  at 37. Instead, Judge Patel found that Mr. Luong did not make "a threshold showing . . . that Ah

6  Muoi was an informant for the government regarding Luong's activities." *Id.* at 37-38. Judge

7  Patel thus concluded that Mr. Luong's "arguments about the government's deliberate omission of

8  Ah Muoi as an informant in order to obtain a wiretap is mere speculation and will not support an

9  evidentiary hearing." *Id.* at 38.[7]

> **3.    Newly-discovered evidence strongly supports Mr. Luong's contention that Ah Muoi has received consideration from the Government.**

11      Mr. Luong contends that newly-discovered evidence regarding Ah Muoi—who recently

12  resurfaced for a false statement prosecution in this District, but was not held to answer for the

13  serious Hobbs Act and firearm charges pending against him in the Central District—supports his

14  contention that Ah Muoi has received consideration from the Government, and he asks the Court,

15  at a minimum, to order discovery regarding Ah Muoi's relationship with the United States so that

16  he may more fully develop this claim for relief.

17      In brief, Mr. Luong summarizes the relevant events as follows:

18  •    In early 1995, Ah Muoi went to trial in District of Massachusetts Case No. 94 Cr.
        10220 (EFH) under the false name Quang Phan, and obtained a judgment of
19      acquittal under Fed. R. Crim. P. 29. *See* D. Mass. Case No. 94 Cr. 10220 (EFH).

20  ////

_____

23  [6]Undersigned counsel is unaware whether the grand jury transcript was ultimately produced to Judge Patel or the defense.

25  [7]Judge Patel's characterization of Mr. Luong's argument—that the Government's omission was necessarily "deliberate"—was curious, given the Court's own acknowledgment

26  that the Northern District authorities were not required to have *personal* knowledge of Ah Muoi's activities as an informant, but instead, that the knowledge of others—*e.g.*, the Boston

27  authorities—could properly be imputed to them. *See also* Dkt. 822 at 2-3 (Mr. Luong arguing that even if Ah Muoi wasn't an informant for the FBI, he may have been an informant for other

28  federal agencies such as the DEA).

- Shortly thereafter, Ah Muoi was subpoenaed to testify before a federal grand jury in Boston, and he disappeared from the grand jury room. Criswell Decl. ¶ 5.

- Following the grand jury proceeding, Boston officials determined that "Quang Phan" was, in fact, Tuan Thanh Nguyen, a.k.a. Ah Muoi, and on August 10, 1995, issued a criminal complaint charging Ah Muoi with making material false statements in violation of 18 U.S.C. § 1001—*i.e.*, for using a false name in judicial proceedings—and obtained a warrant for his arrest. *See* D. Mass. Case No. 95 MJ 429 (JCB).

- The initial indictment in this matter was filed on April 9, 1996. Dkt. 1. Ah Muoi was not named as a defendant. Dkt. 1, 471.

- On March 7, 1997, the United States Attorney's Office in Boston filed an under seal motion in Ah Muoi's false statement case seeking the "production of certain records pursuant to [T]itle 28[,]" which the district court granted. D. Mass. Case No. 95 MJ 429 (JCB), Dkt. 3-4.

- On May 29, 1997, the Government filed a Hobbs Act and firearm case against Mr. Luong, Ah Muoi, and others in the Central District of California, in which it raised allegations similar to those in this case. *See* C.D. Cal. Case No. 97 Cr. 512 (TJH). In that case, some of the defendants pled guilty, others went to trial, and others—including Mr. Luong—were transferred for prosecution in this District. *See id.*

- As of September 4, 2002, Ah Muoi had never made an appearance in the Central District case, and the Honorable Terry J. Hatter entered an order returning his case to the "Clerk's File of Pending Cases[.]" C.D. Cal. Case No. 97 Cr. 512 (TJH), Dkt. 482.

- On April 17, 2003, an individual named Tuan Thanh Nguyen was charged in the Central District of California in a multi-defendant, under seal case alleging violations of Title 21. *See* C.D. Cal. Case No. 03 MJ 146 (UA). On April 25, 2003, Nguyen—identified in that matter as "Seal C"—was appointed an attorney and released on $50,000 bond. *Id.*, Dkt. 9. The docket report does not disclose any additional activity of note in that case, nor its disposition. *See id.*

- On October 4, 2011, the United States Attorney's Office in the Northern District of California identified Ah Muoi, and initiated Rule 5 proceedings against him based upon the 1995 false statement complaint pending against him out of Boston. *See* N.D. Cal. Case No. 12 Cr. 26 (SI). The Government did *not*, by contrast, initiate Rule 5 proceedings against Ah Muoi based upon the Hobbs Act and firearm matter still pending against him in the Central District of California.

- Ultimately, Ah Muoi's false statement case was resolved by Information in this District rather than in Boston. On February 3, 2012, Ah Muoi entered a guilty plea to that charge before the Honorable Susan Illston. *Id.*, Dkt. 15-16.

- At sentencing, the United States recommended a sentence of six months imprisonment; Ah Muoi and U.S. Probation recommended probation. *Id.,* Dkt.17-18.

- On April 13, 2012, Judge Illston sentenced Ah Muoi a term of three years probation. *Id.*, Dkt. 19.

11

1   •   As of this writing, Ah Muoi has never made an appearance in the Central District
        Hobbs Act and firearm case, although the Central District has issued two warrants
2       for his arrest in that matter.  *See* C.D. Cal. Case No. 97 Cr. 512 (TJH).

3       Based upon the foregoing, Mr. Luong contends that strong newly-discovered evidence

4   now corroborates his view that Ah Muoi has received consideration from the Government, likely

5   due to his services as a cooperating source.  Most directly, it strains credulity that the

6   Government would identify Ah Muoi as the subject of the 1995 false statement warrant issued

7   out of Boston—and bring him to justice on that charge—but fail to note that the same individual

8   remains subject to a Central District warrant issuing out of a far more serious Hobbs Act and

9   firearm case.  Government counsel from the Central District expressly informed Judge Patel that,

10  in his view, Ah Muoi was "a fugitive[,]" and that his office would be "happy to get [its] hands on

11  him."  June 29, 1999 RT at 121.  Nevertheless, having located Ah Muoi at least as recently as

12  October 2011, the Government failed to bring Ah Muoi to answer the Central District

13  charges—and possibly the drug charges in C.D. Cal. Case No. 03 MJ 146 (UA) as well—thus

14  sending a clear signal of lenience that Mr. Luong contends likely stems from the (valuable)

15  services Ah Muoi has rendered as a confidential source.

        **4.      The Court should, at a minimum, order discovery regarding Ah
                  Muoi's relationship with the United States.**

16

17      As bearing on Mr. Luong's case, the foregoing revelations are far from academic.  *First*,

18  in the event the Government deliberately misled the Court and defense regarding Ah Muoi's

19  status as a cooperator—and/or failed to correct any prior misstatements once the truth came to

20  light—misconduct of that nature may be sufficiently flagrant to warrant dismissal of the

21  indictment as a matter of due process and/or the Court's supervisory powers.  *See*, *e.g.*, *United*

22  *States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008).  *Second*, even if any suppression of evidence

23  by the Government was inadvertent, Mr. Luong contends that it is still sufficiently material to the

24  Government's necessity showing, *see*, *e.g.*, *Brady v. Maryland*, 373 U.S. 83 (1963), to justify

25  vacatur of his convictions and the entry of an Order granting his motion to suppress, and/or

26  granting him a *Franks* hearing on the question of Ah Muoi.

27  ////

28

                                        12

1    Accordingly, and as set forth in his concurrently-filed Motion for Discovery, Mr. Luong

2    respectfully asks the Court to order discovery regarding Ah Muoi's relationship with the

3    Government—and to hold an evidentiary hearing, as necessary—in order that Mr. Luong may

4    more fully develop the relevant facts regarding Ah Muoi, as bearing on his rights under the

5    Fourth and Fifth Amendments, and Title III.

6    **<u>CLAIM XI</u>**

7    In Claim XI, Mr. Luong contends that trial counsel rendered constitutionally ineffective

8    assistance by failing to present Charlie Reth as a defense witness to exonerate Mr. Luong of the

9    robbery of Aristocrat, Inc., as charged in Counts 13 (Hobbs Act conspiracy), 14 (aiding and

10   abetting a Hobbs Act robbery), and 15 (use of a firearm to commit a violent felony).  Dkt. 2058,

11   2082, 471.  With the assistance of undersigned counsel, Mr. Luong now clarifies that claim as

12   follows, and further, asks the Court to find—with the benefit of newly-discovered evidence—that

13   he is actually innocent of the Aristocrat robbery, and to vacate his convictions on Counts 13-15

14   and resentence him accordingly.

15   **A.    Background.**

16   The Government's theory at trial was that Mr. Luong was a leader of a large organization

17   referred to as "The Company," which primarily engaged in armed robberies of computer

18   companies, but which also conducted heroin distribution.  *See generally* Trial RT 7024-55.

19   According to the Government, "The Company" operated with a three-tiered structure: *viz.*, that

20   (1) Mr. Luong and others served as the leaders, overseeing the organization's operations in

21   general; (2) below them were mid-level "crew chiefs," who recruited crew members and

22   personally oversaw the robberies; and (3) at the bottom were low-level crew members, who acted

23   as the labor force for the robberies and drug deals.  *Id.*

24   One robbery charged in the superseding indictment involved a computer company named

25   Aristocrat, Inc., in Sunnyvale, California ("Aristocrat").  Specifically, Count 13 charged Mr.

26   Luong with conspiracy to rob Aristocrat between August 1 and August 18, 1995.  Dkt. 471.  The

27   Government alleged that the conspiracy consisted of Mr. Luong and co-defendants Mady Chan

28   and Charlie Reth, though Reth was not charged in the count.  *Id.*  Count 14 charged Mr. Luong

1    with aiding and abetting the Aristocrat robbery on August 18, 1995. *Id.*  In Count 15, the

2    Government charged Mr. Luong with use of a firearm during and in relation to the Aristocrat

3    robbery. *Id.*

4         The trial evidence established that an armed robbery occurred at Aristocrat on August 18,

5    1995, and was committed by a group led by an armed gunman identified by witnesses as Reth.

6    *See generally* Trial RT 5323-65 (testimony of Aristocrat personnel).

7         Although Reth did not testify at trial, over the course of numerous pretrial debriefings

8    with the Government, he acknowledged his role as crew chief for armed robberies on behalf of

9    "The Company," and implicated others for their alleged involvement as well, including, at times,

10   Mr. Luong.  *See* Balogh Decl., Ex D.  With respect to Aristocrat specifically, however, Reth (a)

11   acknowledged that he was the crew chief for the robbery, (b) identified a number of other

12   individuals as being involved as well, but (c) *never* identified Mr. Luong as a participant in the

13   incident. *Id.*

14        The trial evidence corroborated Reth's pretrial accounts.  For example, cooperating

15   witness Kevin Liu testified that he received Aristocrat as a possible robbery target from another

16   cooperating defendant, John Chu, approximately three or four months before the robbery took

17   place.  Trial RT 5578-79.  Thereafter, according to Liu, he visited the location with co-defendant

18   (and alleged "Big Brother") Mady Chan, and then gave the job to Reth, at Chan's direction. *Id.*

19   After the robbery, Liu testified that he received a call from Chan, in which Chan informed him

20   that Reth had successfully robbed Aristocrat, and asked Liu to pick up the stolen merchandise.

21   Trial RT 5580-81.

22        Chu's testimony corroborated Liu's.  For example, Chu agreed that he provided

23   Aristocrat as a target to Liu and Chan, and that after Reth accomplished the robbery, Chan alerted

24   him the robbery had been successful.  Trial RT 5055-56.  *See also* Trial RT 5066 (Chu testifying

25   that Reth robbed Aristocrat); Trial RT 5144 (Chu testifying that he provided Aristocrat as a

26   target).

27        Importantly, Liu and Chu not only *omitted* mention of Mr. Luong with respect to

28   Aristocrat, but in fact, affirmatively *exonerated* him of participation in that robbery.  For

14

example, Chu testified that to his knowledge, Mr. Luong was "not involved at all" in the Aristocrat robbery.  Trial RT 2306.  Similarly, Liu testified that as far as he knew, "John That Luong had nothing to do with Aristocrat."  Trial RT 6007.  *See also* Trial RT 6011 (same); Trial RT 6079 (same).[8]

Nevertheless, the Government maintained that Mr. Luong was involved in the Aristocrat robbery, based primarily on wiretapped telephone calls intercepted around the time of the Aristocrat robbery.  In these calls, Mr. Luong never mentioned Aristocrat.  Instead, he talked *with* Reth, and *about* Reth with others (regarding, for example, a requirement that Reth pay a "commission" into a jointly-funded attorney fee reserve), which in the Government's view, gave rise to an inference that Mr. Luong was exerting control, as a general matter, over Reth around the time of the Aristocrat robbery, and thus must have been involved in Aristocrat.  *See generally* Balogh Ex. E (selected transcripts of wiretapped phone calls introduced at trial); *see also* Trial RT 7121-22 ("[T]he Government would submit to you the evidence is clear that Charlie was working for The Company around this time period.  He was being controlled by John Luong, but he was still taking the main direction from Mady Chan, who told him in no uncertain terms to do [the Aristocrat] robbery, which he did, and he did it for The Company.").

Mr. Luong, by contrast, noted that Reth was committing robberies behind his back during the relevant time frame, *see* Trial RT 7185-86 (referring to Trial RT 6009-10, in which Liu testified that he took Mr. Luong to lunch to distract him from Reth's robbery of Data Pro), and that if anything, the wiretaps reflected that in the days leading up to the Aristocrat robbery, Mr. Luong believed that Reth was traveling to Huntington Beach to rob a company called Lifetime Memory, and thus that Reth was "scamming" Mr. Luong by conducting the Aristocrat robbery without Mr. Luong's knowledge or consent.  Trial RT 7184-88; *see also* Balogh Ex. E, GX 72b at 5-7 (conversation between Mr. Luong and Reth concerning "two or three" in L.A.); *id.*, GX

---

[8]Notably, neither Chu nor Liu hesitated to incriminate Mr. Luong with respect to *other* alleged criminal acts.  *See, e.g.*, Trial RT 5452 (Liu testifying that he once met with Mr. Luong and gave him a list of companies to "go rob[,]" including Comtrade and Computer Trend); Trial RT 5074 (Chu testifying that he gave Mr. Luong a list of two robbery targets).

74b at 1 (Mr. Luong telling Reth to go to L.A.); *id.*, GX 77b at 2 (same); *id.*, GX 90b at 1 (Mr. Luong asking Reth if he had "ordered the ticket yet?"); *id.*, GX 96b (conversation between Mr. Luong and Reth regarding travel to L.A.).[9]

The jury adopted the Government's view, and upon conviction, Judge Patel sentenced Mr. Luong to a 20-year consecutive mandatory minimum sentence on Count 15, which alleged use of a firearm during and in relation to the Aristocrat robbery under 18 U.S.C. § 924(c). *See* Dkt. 2036. On appeal, Ninth Circuit rejected Mr. Luong's Rule 29 challenge to his Aristocrat convictions, holding that although "there was no direct evidence that [Mr. Luong] specifically agreed to rob Aristocrat[,]" there was sufficient evidence from which the jury could "infer his agreement from the evidence that he was supervising the crew chief who executed the Aristocrat robbery, actively participated in the selection of the crew chief's *next* robbery target, and directed the crew chief during the time period when Aristocrat was robbed." *Luong*, 215 Fed. Appx. at *2 (emphasis added).

**B.** **Newly-discovered evidence demonstrates that Mr. Luong is actually innocent of the Aristocrat robbery, and this Court should thus vacate Mr. Luong's convictions on Counts 13-15, and resentence him accordingly.**

As should be plain based on the foregoing, Mr. Luong's Aristocrat convictions—including the 20-year mandatory minimum consecutive sentence that resulted under section 924(c)—turned entirely on whether or not Mr. Luong directed Reth to commit the Aristocrat robbery. As of this writing, however, Reth has now joined Liu and Chu in *exonerating* Mr. Luong of any involvement in the Aristocrat offense. *See* Balogh Decl. Ex. F. Because Reth—the tincture of glue that holds Mr. Luong's Aristocrat convictions together—has dispositively erased any reasonable inference to support the Government's case, this Court should find that Mr. Luong is actually innocent of the offense, vacate his convictions on Counts 13-15, and resentence Mr. Luong accordingly.

////

---

[9]The incidents at Aristocrat and Lifetime Memory both took place on August 18, 1995. *See* Trial RT 7173-74.

1          **1.     Reth has exonerated Mr. Luong of the Aristocrat robbery.**

2          On April 23, 2010, Reth gave a taped statement to Loc Ngo, a Sacramento investigator

3   working on Mr. Luong's behalf, and declared under penalty of perjury that his statements were

4   true and correct.  *See* Balogh Decl., Ex. F.  In short, Reth candidly resolved the following facts in

5   Mr. Luong's favor:

6          •      That it was Mady Chan who "call[ed] the shots" on the Aristocrat robbery, not
                  Mr. Luong.  *Id.* at 2;
7
          •      That the Aristocrat robbery site was provided by Chu and Chan, and that Mr.
8                 Luong didn't "know anything about the [A]ristocrat robbery at all."  *Id.*;

9          •      That Reth was—as Mr. Luong argued at trial—"supposed to go to L.A. and see a
                  robbery site" during the relevant time frame, but "instead [he] ended up doing a
10                robbery at Aristocrat[,]" and although he couldn't remember exactly why he
                  "flipped from going to L.A. to going to Aristocrat[,]" "Aristocrat was conducted
11                by Mady Chan[,]" and "John Luong was not involved, John don't even know
                  about that."  *Id.* at 4, 7-8;
12
          •      That Reth could not recall ever giving the Government a statement regarding Mr.
13                Luong's involvement in Aristocrat, because he "only answer[ed] what [his
                  interviewers] ask[ed]" him.  *Id.* at 8;
14
          •      That although law enforcement "always want[ed] to put [Mr. Luong] in the
15                involvement of everything[,]" he was "not involved in everything."  *Id.* at 9; *see
                  also id.* at 10 ("The FBI never asked me if John Luong was involved with the
16                Aristocrat.");

17         •      That if Reth had been called to the stand, "the truth would of came out[.]" *Id.* at
                  10; and most directly—
18
          •      That Aristocrat was "not [Mr. Luong's] robbery site[,]" and accordingly, "John
19                Luong was not and should not be indicted in the Aristocrat robbery, because [it's]
                  not his robbery site."  *Id.* at 11.  *See also id.* at 12 (same); *id.* a 13 ("John Luong is
20                not involved in the Aristocrat.").

21         In sum, Reth—the undisputed crew chief of the Aristocrat robbery, and keystone of the

22   Government's theory of Mr. Luong's culpability—has affirmatively exonerated Mr. Luong of

23   any involvement in the Aristocrat offense.

24         To establish a freestanding claim of actual innocence, a habeas petitioner "must

25   affirmatively prove that he is probably innocent."  *Carriger v. Stewart*, 132 F.3d 463, 476 (9th

26   Cir. 1997) (*en banc*).  Mr. Luong satisfies that standard.

27         To begin, as noted, cooperators Liu and Chu have already exonerated Mr. Luong of

28   Aristocrat at trial.  So too, the Ninth Circuit itself recognized that "there was no direct evidence

                                        17

that [Mr. Luong] specifically agreed to rob Aristocrat." 215 Fed. Appx. at *2.  Accordingly, at bottom, Mr. Luong's liability for Aristocrat turned solely on circumstantial evidence that, as a general matter, he "was supervising" Reth; that he gave Reth his "next robbery target[;]" and that he "directed" Reth "during the time period when Aristocrat was robbed." *Id.*

While the Ninth Circuit may have found these observations sufficient to defeat Mr. Luong's Rule 29 challenge in the *absence* of Reth's declaration, Reth has now foreclosed the incriminating inferences that flow from them, and has done so entirely consistent with Liu's and Chu's exonerating accounts, *viz.*, that it was Chu who gave the robbery site to Liu, Chan, and Reth, with Mr. Luong none the wiser. *See* Balogh Decl., Ex. F.  In sum, given that *three* of the principal actors involved in the Aristocrat robbery have now exonerated Mr. Luong of that offense, this Court should find, at a minimum, that Mr. Luong is "probably innocent[,]" vacate his convictions on the Aristocrat counts, and resentence him without the 20-year consecutive sentence that stems from the section 924(c) conviction.

### C.   Trial counsel rendered ineffective assistance by failing to call Reth to exonerate Mr. Luong on the Aristocrat counts.

In the alternative, the Court should find that trial counsel rendered ineffective assistance by failing to call Reth as an exonerating witness, and should thus vacate Mr. Luong's Aristocrat convictions and grant him a new trial.  As noted, to establish ineffective assistance of counsel, a defendant must demonstrate (1) that "counsel's representation fell below an objective standard of reasonableness[,]" and (2) a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688, 694.

An attorney renders deficient performance by failing to call defense witnesses if counsel makes a "sound strategic choice to present [a particular] defense, but nonetheless failed in his duty to present that defense reasonably and competently." *Alcala v. Woodford*, 334 F.3d 862, 870 (9th Cir. 2003).  That situation occurs, for example, if an uncalled witness's testimony "would have been far more helpful than the testimony of the . . . witnesses who did testify[,]" and thus "a competent attorney would have presented this evidence unless the attorney was unaware of its existence or had a reasonable strategic reason for not doing so." *Id.* at 870-71.

Such is the case here.  To begin, trial counsel was long on notice that over the course of (at least) five pretrial debriefings with the United States, Reth never once implicated Mr. Luong as a participant in the Aristocrat robbery.  *See* Balogh Decl., Ex. D.  *See also United States v. Baker*, 658 F.3d 1050, 1053-54 (9th Cir. 2011) (omission in Government's discovery places defense on notice regarding proof of negative), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (*en banc*).  Indeed, it was likely precisely for that reason that trial counsel attempted to interview Reth in advance of trial, Balogh Decl., Ex. G, though his request was rebuffed by Reth's counsel.  *See id.*

As in *Alcala*, trial counsel for Mr. Luong did ultimately make a "sound strategic choice" to defend the Aristocrat counts on the ground that Mr. Luong did not direct Reth to conduct the Aristocrat robbery, and in that respect, elicited favorable testimony from, *inter alia*, Liu and Chu, and argued exonerating inferences out of the wiretaps.  In contrast to Liu and Chu, however, Reth's exonerating testimony "would have been far more helpful" to Mr. Luong—because *only* Reth was capable of definitively answering the ultimate question at issue: *who* directed his conduct—and for that reason, "a competent attorney would have presented this evidence[.]"  *Id.* at 870-71.  As the Ninth Circuit recognized, Mr. Luong's Aristocrat convictions turned entirely on inferences arising out of his communications with (and about) Reth.  215 Fed. Appx. at *2. Because Reth's testimony would have resolved all such inferences in Mr. Luong's favor—and in a manner consistent with the exonerating testimony already in the record—trial counsel should have called Reth to ensure that this crucial evidence was placed before the jury.

As further evidence on this point, the Court need look no further than trial counsel's performance with respect to Count 18 and Racketeering Act 14, on which, as noted, the jury acquitted Mr. Luong.  To defend those allegations, trial counsel called Xuong Manh "Manson" Quach, a participant in the December 1995 heroin transaction at issue, who testified that "the five ounces [of heroin at issue] didn't come from" Mr. Luong.  Trial RT 6606-11, 6623.  The jury—presumably crediting Quach's testimony—acquitted Mr. Luong of that transaction.  In other words, the record supports Mr. Luong's contention that trial counsel was aware of the ////

19

benefits of calling an exonerating witness, and he thus rendered deficient performance by failing to follow the same course of action with respect to the (far more serious) Aristocrat counts.

Counsel's performance also undermines "confidence in the" jury's Aristocrat verdicts, thus satisfying the second prong of the *Strickland* test. *Alcala*, 334 F.3d at 872, *quoting Strickland*, 466 U.S. at 694. Put another way, "[c]onsidering the totality of the evidence before the jury," "the case against [Mr. Luong on Aristocrat] was only weakly supported by the record and therefore more likely to have been affected by errors than one with overwhelming record support." *Id.* (quotation marks and citations omitted).

Just as in *Alcala*, "the prosecution's [Aristocrat] case was far from compelling[,]" and the "evidence that [Mr. Luong participated in it] was entirely circumstantial." *Id.* So too, Reth's post-trial availability demonstrates that he "could have been called to testify, and [his concurrently-filed declaration is] sufficient to establish what [his] testimony would have been. *Id.* In the final analysis, "[i]f this testimony had been presented along with" Liu's and Chu's exonerating accounts, as well as with the wiretap evidence demonstrating that Mr. Luong believed that Reth was headed to Los Angeles, the "evidence would have given the jury a choice between believing" *three* principal actors involved in the Aristocrat robbery on the one hand, or the Government's attenuated inferences on the other. *Id.* at 873. For this reason, "[i]f trial counsel had presented the evidence establishing that" Mr. Luong had no involvement in Aristocrat, "there is a reasonable likelihood that the jury would have discounted" the Government's circumstantial case, and concluded, at a minimum, that reasonable doubt existed with respect to Mr. Luong's participation in Aristocrat. *Id.* Because Reth's testimony "would have significantly weakened, if not wholly undermined, the prosecution's case[,]" this Court should find both prongs of the *Strickland* test satisfied, and grant Mr. Luong relief.

### CLAIM XII

In Claim XII, Mr. Luong has argued *pro se* that trial counsel rendered constitutionally ineffective assistance by failing to object to the jury charge concerning the substantive robbery counts, Counts 11 and 14. *See* Dkt. 2058, Attachment C; Dkt. 2082. With the assistance of ////

1  undersigned counsel, Mr. Luong respectfully clarifies his argument in support of this claim, and

2  asks the Court to vacate his robbery convictions and grant him a new trial.

3  **A.  Background.**

4  The Government charged Mr. Luong with two counts of robbery affecting interstate

5  commerce in violation of 18 U.S.C. § 1951(a): (1) the March 1995 robbery of Hokkins

6  Systemation in San Jose, California (Count 11), and (2) the August 1995 robbery of Aristocrat,

7  Inc., in Sunnyvale, California (Count 14).  Dkt. 471.  In both counts, the Government charged

8  Mr. Luong as principal and aider and abettor under 18 U.S.C. § 2.  *Id.*  Mr. Luong was not

9  personally present for either robbery.

10  At the charging conference, counsel for co-defendants Hoang Ai Le and Mady Chan

11  objected to the inclusion of an aiding and abetting instruction on the ground that "it's going to be

12  so confusing in the context of both the RICO, the RICO conspiracy, and all these conspiracies

13  and substantive robberies[,]" "especially with the *Pinkerton*."[10]  Trial RT 6806-07.  Counsel for

14  Mr. Luong expressed no opinion on the topic, but the United States agreed to omit an aiding and

15  abetting instruction.  *Id.*

16  In the final charge, Judge Patel included neither an aiding and abetting nor a

17  *Pinkerton* instruction with respect to the substantive robbery counts.  *See* Dkt. 1253.[11]  Instead,

18  the robbery instructions read, in pertinent part, as follows:

19  Defendants John That Luong and Mady Chan are charged in Count [XX]
20  of the Superseding Indictment with armed robbery by force in violation of
   Section 1951(a) of Title 18 of the United States Code.  In order for the
   defendants to be found guilty of that charge, the government must prove
21  each of the following elements beyond a reasonable doubt:

22  First, the defendants *caused* employees of [company] to part with
   computer chips and parts in their possession by the wrongful use or threat
23  of force or fear;

24  Second, the defendants acted with the intent to obtain the property of
   [company] that the defendants knew they were not entitled to receive; and
25

26  —————————————

27  [10]*Pinkerton v. United States*, 328 U.S. 640 (1946).

28  [11]Judge Patel did, by contrast, give a *Pinkerton* instruction with respect to the section
   924(c) counts.  *See* Dkt. 1253, Instr. 40.

21

Third, commerce from one state to another was affected in some way.

Dkt. 1253, Instr. 34-35 (emphasis added).  To Mr. Luong's knowledge, the record does not

disclose any objection by trial counsel to the instruction as given.

**B.     Trial counsel rendered ineffective assistance by failing to object to the use of the word "caused" in the robbery instructions.**

Mr. Luong contends that trial counsel rendered ineffective assistance by failing to object

to Judge Patel's use of the word "caused" in the substantive robbery charge.

With respect to the first prong of the *Strickland* test, the Court should find that counsel

rendered deficient performance by failing to observe—and object—that the robbery instructions

failed to conform not only to the Ninth Circuit Model Instruction in effect at the time of Mr.

Luong's trial, but also the plain language of section 1951.  To begin, it is clear that the

instructions tracked closely—and thus derived from—the 1997 Model Instruction for Hobbs Act

extortion by force, *i.e.*, Model Instruction 8.31.1 (1997 ed.).  *See* Balogh Decl., Ex. H.

As trial counsel failed to note, however, in 2000, the Ninth Circuit adopted a favorable

amendment to the model instruction that Judge Patel did not incorporate—*i.e.*, the Court of

Appeals replaced the word "caused" in the first element with the word "induced[.]"  *See* Ninth

Cir. Model Criminal Instr. 8.117 (2000 ed.); Balogh Decl., Ex. I.  The Ninth Circuit's

amendment was well taken, for at least two reasons.  First, the word "caused" does not appear

anywhere in section 1951.  *See* 18 U.S.C. § 1951.  By contrast, the statute defines "extortion" as

"the obtaining of property from another, with his consent, *induced* by wrongful use of actual or

threatened force, violence, or fear, or under color of official right."  *Id.* (emphasis added).

Accordingly, the amendment hewed closer to the statutory text, thus giving force to Congress's

choice of words, and more accurately conveying the elements of the offense.

Second, the Court of Appeals's (and statute's) use of the word "induced" is far more

clear—and thus more fair—than the slippery concept of "causation," which the Ninth Circuit

rightly abandoned.  Mr. Luong's case shows how this ambiguous phrase permitted an improper

conviction: while it clear that the jury found that Mr. Luong "caused" employees of Hokkins and

Aristocrat to part with computer chips and parts in their possession by the wrongful use or threat

of force or fear, it is far less clear—indeed, entirely unclear—what the jury meant by that finding. Did the jury find that Mr. Luong was the "proximate" cause of the employees' acts? The "but for" cause? Did some of the jurors find "but for" causation, and others find "proximate" causation? Something else entirely? Particularly lacking an instruction providing guidance as to what "causation" was intended to convey in this context, it is all but impossible to know whether the jury actually found the elements of Hobbs Act robbery beyond a reasonable doubt.

In response to Mady Chan's section 2255 motion, the Government has offered its explanation: that Judge Patel's use of the word "caused" was intended to convey a theory of vicarious liability under 18 U.S.C. § 2(b), and accordingly, that this Court should find that the jury did, in fact, find vicarious liability, as charged in the superseding indictment. *See* Dkt. 2100 at 21-22. The Government is incorrect. Putting aside that Judge Patel plainly took the word "caused" from the 1997 Hobbs Act extortion model instruction, not section 2(b), the Government is also wrong on the law: aiding and abetting under section 2(a) is not interchangeable with a "causation" theory of vicarious liability under section 2(b), and would have been improper in this case.

Section 2(a) provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Section 2(b), by contrast, provides that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

In other words, unlike section 2(a)—which is the theory of vicarious liability advanced by the Government in this case (but which was omitted from the final jury instructions, and thus could not support conviction)—section 2(b) addresses so-called "dupe" liability, in which a defendant uses an "innocent pawn" to commit a federal offense. *See United States v. Haeng Hwa Lee,* 602 F.3d 974, 976 (9th Cir. 2010) (under section 2(b), "a principal is guilty of an offense if [he] used an innocent pawn to cause an act to be done which, if performed by the principal, would be unlawful"). Because the Government neither charged nor argued a section 2(b) theory of vicarious liability against Mr. Luong—indeed, any such theory would have lacked

1   support in the trial evidence—this Court should reject the Government's reliance on that statute,

2   and instead find that Judge Patel *only* gave the 1997 model instruction for *principal* Hobbs Act

3   extortion liability.  Further, because trial counsel failed to object to the Court's reliance on that

4   outdated (and legally improper) instruction, this Court should find that counsel rendered deficient

5   performance.

6          The Court should also find that the deficient performance prejudiced Mr. Luong.  Most

7   directly, the concepts of "causation" and "inducement" are far from interchangeable.  Indeed, it is

8   not difficult to imagine a scenario in which a defendant "causes" an act, but did not "induce" it.

9   For example, imagine a defendant who sells drugs to a buyer, and the buyer ingests the substance

10  days later, and while intoxicated, gets behind the wheel of a car, and crashes it into a storefront,

11  causing property damage to the store and injuring himself.  Plainly, the drug dealer "caused" car

12  accident within a literal meaning of "but for" causation—and may have even "proximately"

13  caused the accident under some definitions of that term—but he certainly did not "induce" the

14  user to drive under the influence, let alone crash the car into a storefront.

15         Similarly in Mr. Luong's case, a proper Hobbs Act extortion instruction would have

16  required the jury to find that Mr. Luong personally "induced" the computer company employees

17  to part with company property.  By contrast, the "causation" instruction, as given, permitted the

18  jury to convict Mr. Luong based solely on the vague proposition that he, in some sense, triggered

19  a series of downstream events that ultimately culminated in the employees relinquishing

20  company property.  That result, however, is inconsistent with the plain language of section 1951,

21  and is improper.  Moreover, in Mr. Luong's case specifically, the error was further compounded

22  by the fact that Mr. Luong was not alleged to have been personally present at either the Hokkins

23  or Aristocrat robberies, thus giving rise to an elevated risk that, although the jury plainly believed

24  that he "caused" the robberies in some vague sense of that term, it may well *not* have believed

25  that he "induced" the employees to part with computer parts.  For these reasons, Mr. Luong

26  respectfully asks the Court to find that trial counsel rendered ineffective assistance, and grant him

27  relief.

28  *////*

1

## **CLAIM XIII**

2

In Claim XIII, Mr. Luong has argued *pro se* that appellate counsel rendered

3 constitutionally ineffective assistance by failing to identify and present meritorious issues on

4 appeal.  Dkt. 2058, Attachment C; Dkt. 2082 ¶ 8.  With the assistance of undersigned counsel,

5 Mr. Luong now presents additional argument in support of this claim, and respectfully expands

6 the challenge to include (i) a claim of ineffective assistance of trial counsel, and (ii) an

7 independent claim challenging Judge Patel's imposition of multiple section 924(c) sentences.

8

### **A.      Background.**

9

In his initial direct appeal, Mr. Luong raised numerous challenges to his convictions, and

10 asked the Ninth Circuit to remand for resentencing in light of *United States v. Booker*, 543 U.S.

11 220 (2005).  *See Luong*, 215 Fed. Appx. at * 4.  The Ninth Circuit affirmed his convictions, but

12 remanded for plenary resentencing.  *Id.*

13

Upon resentencing, Mr. Luong raised what he believed to be proper sentencing

14 arguments, including that (1) the penalty structure of 18 U.S.C. § 924(o), which applies to

15 individuals who *conspire* to violate § 924(c), should be applied to him rather than section 924(c)

16 itself, because that is what Congress intended in the circumstances of this case (in which Mr.

17 Luong did not personally use a firearm); and (2) the indictment's failure to specifically charge

18 "second or subsequent" offenses under § 924(c) precluded the stacking of section 924(c)

19 sentences.  Judge Patel rejected these arguments, and sentenced Mr. Luong to sixty-five years

20 imprisonment, with twenty-five years resulting from his section 924(c) convictions—*i.e.*, five on

21 the first and twenty on the second.  *Luong*, 627 F.3d at 1308.

22

On appeal, the Ninth Circuit declined to address Mr. Luong's arguments, concluding that

23 they were, in fact, challenges to the section 924(c) *convictions*, were thus outside Judge Patel's

24 resentencing mandate, and as a result, that the Court lacked jurisdiction to hear them.  *Id.* at

25 1309-11.  For the reasons that follow, Mr. Luong contends that trial and appellate counsel

26 rendered ineffective assistance by failing to raise these challenges prior to his second direct

27 appeal.  In addition, Mr. Luong contends that Judge Patel erred in imposing multiple sentences

28 ////

under section 924(c) because the jury found a single, overarching Hobbs Act conspiracy, and multiple section 924(c) convictions cannot be tied to a single underlying crime.

**B.      There is a reasonable probability of a different result had Mr. Luong's trial and appellate counsel raised his claim for relief under 18 U.S.C. § 924(o).**

Federal conspiracy law generally subjects co-conspirators to the same penalties as direct perpetrators of a given crime. Section 924 of Title 18 is different, however, in that it provides an independent penalty provision for those who conspire to violate section 924(c). *See* 18 U.S.C. § 924(o) (providing, in relevant part, that a "person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both"). Thus, it should be clear that Congress intended to provide a distinct penalty for those whose firearms liability stems from a conspiracy, as opposed to those who directly arm themselves or who aid and abet such arming.  Mr. Luong contends that Judge Patel should have given force to that intent.

Several principles support Mr. Luong's contention.  First, where Congress makes clear its intent that a specific provision in a statute should control over a more general provision in the same statute, that intent trumps the Government's charging decisions. *See*, *e.g.*, *Busic v. United States*, 446 U.S. 398, 406 (1980) (interpreting an older version of section 924(c) and declining to extend the reach of its mandatory minimum penalties).  In enacting section 924(o) to complement section 924(c), Congress expressed its intent that conspiratorial liability for gun use was to be treated differently that a principal's liability for gun use, and that conspiracy was to be subjected to a different penalty provision. Congress's clear purpose was that defendants convicted of gun offenses premised on conspiratorial liability would not be subject to the consecutive, mandatory minimum sentence scheme of section 924(c). *Cf. Bailey v. United States*, 516 U.S. 137, 150 (1995) ("Congress [knows] how to draft a statute to reach a firearm that was 'intended to be used.' In § 924(c)(1), it chose not to include that term, but instead established the 5 year mandatory minimum only for those defendants who actually 'use' the firearm."); *United States v. Foreman*, 914 F. Supp. 385, 388 (C.D. Cal. 1996) ("The purpose of section 924(c) is to single out the actual user or carrier of a gun in the commission of a violent crime.  This person is

deemed more culpable for the gun offense, and the added violence that flows from using or carrying a gun.") (emphases added).

There is no question that, as a general matter, when an act violates more than one statutory provision, the Government has the option to select the provision under which it will prosecute. That general rule has an exception, however, which is when Congress clearly intends that only one of the provisions should be applied in a particular context. *United States v. Castillo-Felix*, 539 F.2d 9, 14 (9th Cir. 1976) (so noting). By enacting section 924(o), Congress evinced its clear intent that *this* was the provision to be applied to those who are vicariously liable through conspiracy principles for the use of a gun. One court has set out the pertinent canon of statutory construction as follows:

> When there is in the same statute a specific provision and also a general one, which in its most comprehensive sense would include matters embraced in the specific provision, the general provision must be understood to affect only those cases within its general language that are not within the provisions of the specific provision. The result is that the specific provision controls. See 73 Am.Jur.2d, Statutes, § 257 (1974).

*Ziegler v. American Maize-Products Co.*, 658 A.2d 219, 222 (Me. 1995).

In addition, applying *Pinkerton* liability rather than section 924(o) to defendants such as Mr. Luong generates absurd results. Under *Pinkerton*, a defendant is liable as a principal for a co-conspirator's use of a firearm, as long as that use was reasonably foreseeable in furtherance of the conspiracy. Under section 924(o), by contrast, one must specifically intend that the other person use or carry the firearm. Most directly, it strains reason to assert that Congress would have intended to impose the greater penalties of § 924(c) to those held liable under a *lesser* standard of *mens rea*. Stated differently, there is no principled reason why one who specifically intends and agrees that another person use or carry a firearm in connection with a crime of violence should be subject to a *lesser* penalty—*viz.*, one that carries neither a mandatory minimum nor a requirement that it be imposed consecutive to any other sentence imposed—than one who has no such intent, and made no such agreement, but was merely found to foresee its occurrence.

////

27

This concept—that section 924 should not be interpreted to punish more harshly those guilty of lesser offenses—has been adopted by other courts.  For example, the Eighth Circuit, when called upon to construe the prefatory language of § 924(c)(1)—which provides that the minimum sentences set forth therein shall apply "[e]xcept to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law"—refused to read that phrase to mean what it literally said, holding instead that it does not apply to any greater minimum sentence, such as that for the predicate drug or violent crime, but solely to those specifically applicable to the gun-related conduct proscribed in the section itself.  *See United States v. Alaniz*, 235 F.3d 386 (8th Cir. 2000).  *But see United States v. Williams*, 558 F.3d 166 (2d Cir. 2009) (reaching opposite result after affording statutory terms their plain meaning).  In reaching its result, *Alaniz* relied on the same rationale that Mr. Luong advances now:

> [Deeming the section's] mention of a 'greater minimum sentence' to refer to a sentence for the predicate crime[] fails to give the statute a sensible construction. That construction would punish those guilty of severe offenses more leniently, and those guilty of less severe offenses more stringently, an illogical result. The most serious drug crimes and crimes of violence (those already carrying mandatory minimum sentences) would not be enhanced by a consecutive firearm sentence despite the fact that a gun was involved. Meanwhile, less serious crimes (to which no minimum mandatory sentences apply) would be enhanced by a consecutive firearm sentence when committed with a gun.

235 F.3d at 389 (emphases in original). Mr. Luong seeks just such a "sensible construction" that avoids "an illogical result[,]" and it is reasonably probable that the Ninth Circuit would have adopted that construction if presented with a timely (and preserved) claim for relief.

Notably, in rejecting *Alaniz*'s construction of the "except" clause, *Williams* nonetheless also employed a rationale that supports Mr. Luong's claim. There, the Government argued in favor of the *Alaniz* construction, as follows:

> [The government] provides the example of a defendant who possessed 500 grams of cocaine, subjecting him to a five-year minimum sentence under 21 U.S.C. § 841(b)(1)(B), and brandished a firearm in furtherance of that offense, subjecting him to a consecutive seven-year minimum sentence, resulting in a mandatory minimum sentence of twelve years.  But if that defendant had possessed five kilograms of cocaine—ten times more—he would be subjected only to the ten-year minimum sentence under 21 U.S.C. § 841(b)(1)(A).  The lower seven-year minimum for brandishing the firearm would not apply.  Thus, a defendant could be subjected to a lower total mandatory minimum sentence for a more severe crime.

28

*Williams*, 558 F.3d at 174.  The court rejected that argument on the ground that, under its literal reading of the statute, the district court still maintained the discretion to avoid the feared anomalies:

> The literal wording leaves no defendant unsentenced.  Indeed, it leaves sentencing judges free to impose precisely the same number of years that the Government contends should have been imposed on [the defendant], but authorizes them to do so as a matter of discretion, not as a requirement.

*Id.* at 175 (citation, internal quotation marks and ellipsis omitted).

Justice Breyer made a similar point in discussing the application of the rule of lenity with respect to a different § 924(c) issue:

> [I]n the case of a mandatory minimum, an interpretation that errs on the side of exclusion (an interpretive error on the side of leniency) still permits the sentencing judge to impose a sentence similar to, perhaps close to, the statutory sentence even if that sentence (because of the court's interpretation of the statute) is not legislatively *required* . . . . [¶] On the other hand, an interpretation that errs on the side of inclusion requires imposing . . . years of additional imprisonment on individuals whom Congress would not have intended to punish so harshly.

*Dean v. United States*, 556 U.S. 558, 584 (2009) (Breyer, J., dissenting) (emphases in original).

The point, simply stated, is that by construing section 924(c) not to punish individuals more severely when gun use was merely reasonably foreseeable, as opposed to those who—more culpably—specifically intended that others use firearms, the Ninth Circuit could have left it to the district courts to exercise their discretion to fashion the most just and reasonable punishment.  It is reasonably probable that such a sensible construction of section 924 would have been adopted had prior counsel timely raised this claim prior to Mr. Luong's sentencing appeal.

*United States v. Wegg*, 919 F. Supp. 898 (E.D. Va. 1996) sets forth an instructive discussion. There, the Government charged and secured felony convictions in violation of section 924(a)(1)(A), for making false statements to a licensed firearms dealer, on aiding-and-abetting and conspiracy theories.  The district court, however, refused to impose felony sentences, reasoning that Congress had made clear that firearms dealers could not be prosecuted as principals under the statute's felony provisions, so the Government would not be permitted to circumvent Congress's intent by securing felony sentences by the simple expedient of charging a

29

1  firearms dealer under vicarious liability theories.  *Id.* at 901; *see also id.* ("the Court believes

2  defendant's convictions for aiding and abetting [and conspiracy] must be punished under the

3  misdemeanor provisions applicable to licensed dealers, and not the general felony provision

4  which does not apply to dealers (but would according to the government through the aiding and

5  abetting [and conspiracy] statute[s])").

6          Mr. Luong's situation is analogous.  Conspirators are similar to the firearms dealers

7  addressed in *Wegg*, in that they are specifically addressed in section 924.  This Court should not

8  permit the Government to evade the provisions of § 924(o) simply due to its choice of

9  prosecution theories, as the clear purpose of Congress in enacting section 924(o) was to subject

10  to a particular penalty structure those held responsible for another's use of a gun on a theory of

11  co-conspirator liability.

12          The Government's response to Mr. Luong's argument further demonstrates the merit of

13  Mr. Luong's position.  According to the Government, the dispositive point is that the superseding

14  indictment charged Mr. Luong and his co-defendants with section 924(c) offenses—and the jury

15  convicted on that basis—while section 924(o) is "a separate crime that was neither charged in the

16  superseding indictment, submitted to the jury, nor played any involvement in these proceedings."

17  (Government's Answering Brief on Second Appeal at 29; *see also* Government's Consolidated

18  Sentencing Reply, Dkt. 1936, at 2 (a defendant "must be sentenced for the crimes of which he

19  was convicted").)

20          The Government is wrong.  As an initial matter, the indictment's citation to 924(c) is

21  irrelevant as a matter of law.

> It is the statement of facts in the pleading, rather than the statutory citation,
> that is controlling, and if an indictment or information properly charges an
> offense under the laws of the United States it is sufficient, even though the
> United States Attorney or the grand jury may have suppose that the
> offenses charged were covered by a different statute.

25  *United States v. Wuco*, 535 F.2d 1200, 1202 n.1 (9th Cir. 1976); *see also United States v.*

26  *Bonallo*, 858 F.2d 1427, 1430 (9th Cir. 1988) ("When construing the meaning of an indictment,

27  the description of the alleged conduct is far more critical than the indictment's prefatory language

28  or its citation of a particular provision of a statute."); Advisory Committee Note to Fed. R. Crim.

P. 7(c) ("The law at present regards citations to statutes or regulations as not a part of the indictment.").  Indeed, it is precisely because of the immateriality of the statutory citation that "a conviction can be sustained on the basis of a statute not expressly charged in the indictment." *Id.*, *citing United States v. Hutcheson*, 312 U.S. 219, 229 (1941) *and Williams v. United States*, 168 U.S. 382, 389 (1897) ("It is wholly immaterial what statute was in the mind of the District Attorney when he drew the indictment, if the charges made are embraced by some statute in force.").

Here, although Government may well have had section 924(c) in mind when drafting the superseding indictment, the *actual language* in the charging document describing the alleged offense conduct reads like a section 924(o) offense.  Count 12, for example, pertaining to the Hokkins Systemation robbery, reads as follows:

**COUNT TWELVE:** (18 U.S.C. § 924(c)(1) – Use of a Firearm to Commit a Violent Felony)

The Grand Jury further charges that:

On March 14, 1995, in San Jose, County of Santa Clara, State and Northern District of California,

JOHN THAT LUONG

HUY CHI LUONG

MADY CHAN

CHHAYARITH RETH

HOANG AI LE

NGHIA THANH NGUYEN

defendants herein, and others known and unknown to the Grand Jury, *who were members of the conspiracy charged in Count Ten, which is incorporated by reference as if fully set forth herein*, did knowingly use and carry firearms during and in relation to crime of violence, namely, the offense alleged in Count Eleven of this indictment, the Hokkins Systemation robbery, which is incorporated by reference as if fully set forth herein.

All in violation of Title 18, United States Code, Section 924(c)(1).

Dkt. 471 (emphasis added.)

////

1    It was appropriate for the superseding indictment to incorporate by reference other counts.

2  *See* Fed. R. Crim. P. 7(c)(1) ("A count may incorporate by reference an allegation made in

3  another count"). Where a count expressly incorporates by reference allegations of previous

4  counts, those allegations are to be treated as being in the count "for all purposes." *United States*

5  *v. Main*, 28 F. Supp. 550, 555 (S.D. Tex. 1939). And, although it is generally improper "to look

6  beyond the borders of a particular count to determine what offense is charged," that is not so

7  "where a count incorporates other allegations expressly." *United States v. Redcorn*, 528 F.3d

8  727, 734-35 (10th Cir. 2008).

9    The conspiracy in Count 10 was expressly and fully incorporated by Count 12, just as the

10  other gun count expressly and fully incorporated the charged mini-conspiracy associated with it.

11  Dkt. 471   Each of those incorporated counts charged a conspiracy to commit a substantive

12  Hobbs Act violation "by armed robbery." Thus, the gun counts necessarily charged Mr. Luong

13  with "conspir[ing] to commit an offense under subsection (c)," namely, the use or carrying of a

14  firearm in relation to a crime of violence. In other words, they charged section 924(o) offenses.

15  Although it may be true that the section 924(c) counts did not employ the precise wording of

16  section 924(o), that is not the test. They charged acts—conspiring to use or carry firearms in

17  connection with crimes of violence—that constitute offenses under § 924(o), and pursuant to the

18  Government's own argument—that the indictment is dispositive—Mr. Luong should have been

19  sentenced under that section.

20    Mr. Luong also notes that his argument finds support in numerous jurists' longstanding

21  concern over the mandatory sentencing scheme set forth in section 924(c). The draconian impact

22  of the consecutive sentences mandated by that section, as construed in *Deal v. United States*, 508

23  U.S. 129 (1993) (holding that consecutive, enhanced sentences may be imposed under the statute

24  for multiple firearms convictions in the same proceeding) has frequently been recognized. *See*,

25  *e.g.*, *United States v. Andrews*, 75 F.3d 552, 558 (9th Cir. 1996) ("The fact that 'section 924

26  sentences can produce anomalous results and will provide no additional deterrence . . . cannot

27  defeat the plain language of the statute.'"), *quoting United States v. Fontanilla*, 849 F.2d 1257,

28  1258 (9th Cir. 1988); *United States v. Washington*, 301 F. Supp. 2d 1306, 1309 (M.D. Ala. 2004)

1   (characterizing 40-year sentence, 30 years of which attributable to 924(c), as "unconscionable,"

2   "irrational," "shockingly harsh," and "grossly disproportionate"); *United States v. Hungerford*,

3   465 F.3d 1113, 1118-19 (9th Cir. 2006) (Reinhardt, J., concurring) (referencing sentence

4   imposed under § 924(c) as "irrational, inhumane, and absurd" and Congress's minimum

5   mandatory sentencing scheme generally as "cruel and unjust" and inconsistent with "the

6   controlling principles [of] fairness, proportionality, prudence and informed discretion"); *United*

7   *States v. Zhou*, 428 F.3d 361, 369 n.5 (2d Cir. 2005) (noting "the potentially staggering

8   implications of the Deal holding are well-illustrated in this case").

9        In connection with a then-pending bill seeking to overturn the *Deal* holding and permit

10   the stacking of section 924(c) mandatory sentences only if a person "is convicted under this

11   subsection after a prior conviction under this subsection has become final," Judge Carnes,

12   testifying on behalf of the Judicial Conference of the United States, presented a statement before

13   a House Subcommittee.  Http://judiciary.house.gov/hearings/printers/111th/111-48_51013.PDF.

14   One section singled out "The Need to Unstack § 924(c) Penalties," identifying that statute's

15   consecutive mandatory sentencing provisions as one of the "most egregious mandatory minimum

16   provisions that produce the unfairest, harshest, and most irrational results."  *Id.* at 24. The

17   Judicial Conference "explicitly endorsed seeking legislation that would unstack § 924(c)

18   penalties and permit the statute to operate as a true recidivist statute[,]" *id.* at 25, that is, a statute

19   in which the "second or subsequent conviction" enhancement "would apply only to defendants

20   who have been previously convicted of a § 924(c) offense prior to the firearm possession that led

21   to the § 924(c) charge being sentenced[.]" *Id.* at 30.  No Congressional action has as yet been

22   taken that would benefit Mr. Luong, but nonetheless, the harsh reality articulated in the foregoing

23   decisions and Congressional testimony bolster his contention that had the Ninth Circuit been

24   timely presented with this argument, it is reasonably probable that the second appellate panel

25   would have agreed with it.

26        Finally, because (a) the argument arises out of the plain text of the statute under which

27   Mr. Luong faced (and ultimately received) a consecutive 25-year mandatory minimum sentence,

28   and (b) there is no conceivable strategic reason for failing to present this meritorious claim for

1    relief—which if timely presented, could have saved Mr. Luong a quarter-century in

2    custody—this Court should find that trial and appellate counsel rendered deficient performance

3    by failing the make the argument.

### C. There is a reasonable probability of a different result had Mr. Luong's trial and appellate counsel raised his claim for relief that no more than one sentence pursuant to section 924(c) could have been imposed upon him because the superseding indictment failed to charge any of the section 924(c) violations as "second or subsequent" offenses.

7    As noted, Mr. Luong was convicted of two counts of using a firearm in connection with

8    the charged "mini" conspiracies, in violation of 18 U.S.C. § 924(c)(1).  Neither count included

9    language that the purported offense represented a second or subsequent offense, nor did either

10   incorporate by reference the other section 924(c) count.  Dkt. 471.  Under these circumstances,

11   Mr. Luong contends the section 924(c) sentences cannot be permissibly stacked against him.

12   In *United States v. Rodriguez-Gonzales*, 358 F.3d 1156 (9th Cir. 2004), the defendant was

13   charged in an information with two counts of illegal entry into the United States in violation of

14   18 U.S.C. § 1325.  That statute authorizes a maximum six-month sentence for a first illegal entry

15   and a maximum twenty-four-month sentence for a subsequent illegal entry.  The information's

16   second count neither charged the entry alleged therein as a subsequent entry nor incorporated the

17   allegations of the first count.  Relying on the "well-established requirement that each count

18   against a defendant in an information or indictment must sufficiently levy the charge in and of

19   itself and thus stand on its own," the Ninth Circuit held that the Government's failure to

20   explicitly charge the second entry as a second offense meant that the maximum sentence that

21   could be imposed was that prescribed for first offenses, namely, six months.  *Id.* at 1158.

22   Notably for Mr. Luong's case, the *Rodriguez-Gonzales* Court distinguished *Deal v.*

23   *United States*, 508 U.S. 129 (1993) (holding that a jury conviction on one count in an indictment

24   may render a conviction on a following count in the same indictment to be a "subsequent

25   conviction" for which the defendant may be subject to an increased penalty) on the ground that

26   *Deal* merely held an increased penalty was permissible in such multi-count situations, but did not

27   address what was necessary to trigger it.  *Id.* at 1159. The Court noted that the Government was

28   free to have charged the defendant with a subsequent violation of the statute in its second count,

1    and thereby receive the benefit of *Deal*, but it had lost that opportunity through its failure to so

2    charge.  In the words of the panel, "*Deal* did not address pleading requirements. . . . [W]hile *Deal*

3    illustrates that the Government need not hold separate trials in order to subject a defendant to

4    multiple counts under a statute, it said nothing about how those counts should be charged in the

5    indictment."  *Id.*

6         Because the Government failed to charge second or subsequent offenses under section

7    924(c), *Rodriguez-Gonzales* compels the conclusion that Mr. Luong's consecutive 25-year

8    sentence is unlawful, and particularly so given the harsh 20-year mandatory minimum applicable

9    to the purported "second or subsequent" offense.  *See United States v. O'Brien*, 542 F.3d 921,

10   925 (1st Cir. 2008) (noting Supreme Court's teaching that "a significantly longer prison term

11   points toward treating the triggering fact as an element of the crime" must be pled.").  So too,

12   because there was no conceivable strategic reason for prior counsel not to timely raise this

13   meritorious argument, the Court should also find deficient performance.

> **D.     The Court should find Mr. Luong's sentence unlawful because the jury
> found a single, overarching Hobbs Act conspiracy, and multiple section
> 924(c) convictions cannot be tied to a single underlying crime.**

> **1.     Background.**

17        In Counts 10 and 13, the Government charged Mr. Luong with separate conspiracies to

18   violate the Hobbs Act by committing the computer-chip robberies charged in Counts 11, and 14

19   (Hokkins and Aristocrat).  Dkt. 471.  In Counts One and Two, however, the superseding

20   indictment also alleged that, in agreeing to participate (and participating) in a RICO enterprise,

21   the defendants entered into a single conspiracy to commit all of the computer chip robberies

22   described in the indictment.  *Id.*  Specifically, Act One of the Count One substantive RICO

23   charge alleged a single Hobbs Act conspiracy between January 1, 1995, and April 9, 1996,

24   among the four defendants convicted at trial—Mr. Luong, Huy Chi Luong, Mady Chan, and

25   Hoang Ai Le—and eleven others, to commit armed robberies of computer chip companies in the

26   Northern, Eastern, and Central Districts of California, the District of Oregon, and the District of

27   Minnesota.  *Id.*

28   ////

Count Two charged the trial defendants and thirteen others with a conspiracy between January 1995 and April 1996, to commit the RICO violation charged in Count 1.  Dkt. 471.  It alleged that the defendants agreed to participate in the conduct of the affairs of the enterprise detailed in Count One through a pattern of racketeering activity and that two or more acts of racketeering, also detailed in Count One, would be committed in the conduct of the affairs of that enterprise.  *Id.*  Thus, Count Two charged Mr. Luong and others with a single, unified conspiracy to commit the racketeering acts in Count One, which included the broad Hobbs Act conspiracy alleged in Act One.  Every computer company robbery and attempted robbery described elsewhere in the indictment was also alleged as one of the 54 overt acts in the Count Two RICO conspiracy.  *Id.*

In presenting their Rule 29 motions, counsel for the defendants pointed out that the first predicate act alleged in support of the RICO offense charged in Count One was a conspiracy to commit Hobbs Act robberies, and that the conspiracy to rob encompassed all eight robberies charged elsewhere in the indictment: *i.e.*, those of MDC, Unigen, Hokkins, Unicom, NEI, Aristocrat, PKI, and Ace Micro.  Counsel argued that "the individual conspiracies are subsumed in the Hobbs Act conspiracy that is the first predicate or racketeering act" and therefore the Government "should be forced to elect between the individual conspiracies . . . and the predicate act."  In denying the defense motions, the Court simply stated that it had previously denied defense contentions that the charges in the indictment were "duplicitous or multiplicitous," and that it did not "find that the evidence really supports a different conclusion."

Mr. Luong then raised the claim in his first direct appeal, but the Ninth Circuit turned it aside, appearing to misconstrue it as a Double Jeopardy claim.  *See* 215 Fed. Appx. at *2.  In Mr. Luong's second appeal, the Ninth Circuit rejected the claim for lack of jurisdiction.  *Luong*, 627 F.3d at 1311-12.

### 2.    Argument.

In *Braverman v. United States*, 317 U.S. 49 (1942), the Supreme Court held that where a defendant is a member of a single overall conspiracy, he cannot be convicted of multiple subsumed conspiracies.  *See also United States v. Broce*, 488 U.S. 563, 570 (1989) ("A single

36

1   agreement to commit several crimes constitutes one conspiracy.").  That principle requires that

2   Mr. Luong be sentenced solely on the basis of a single § 924(c) count.  The jury expressly found

3   one overarching Hobbs Act conspiracy in this case, and it returned a finding on Racketeering Act

4   One, contained in the substantive RICO count, which charged that conspiracy.  There is no

5   question that this overall conspiracy included the subsidiary conspiracies (Counts 10 and 13),

6   which were used as predicates for Mr. Luong's two section 924(c) charges.  The superseding

7   indictment was therefore drafted to permit multiple section 924(c) sentences based on the

8   overarching conspiracy and the multiple, subsumed conspiracies. The legal problem, which—as

9   described above, has yet to be addressed on the merits by any court—is that the controlling legal

10  principle precludes multiple § 924(c) convictions from being linked to a single underlying crime,

11  which is what effectively occurred in this case.

12       In *Braverman*, the Court wrote:

13           Whether the object of a single agreement is to commit one or many
             crimes, it is in either case that agreement which constitutes the conspiracy
14           which the statute punishes.  The one agreement cannot be taken to be
             several agreements and hence several conspiracies because it envisages
15           the violation of several statutes rather than one.

16  317 U.S. at 53-54 (citations omitted); *see also* Model Penal Code § 5.03(3) ("If a person

17  conspires to commit a number of crimes, he is guilty of *only one* conspiracy so long as such

18  multiple crimes are the object of the same agreement or continuous conspiratorial relationship.")

19  (emphasis added).

20       In *United States v. Anderson*, 59 F.3d 1323 (D.C. Cir. 1995) (*en banc*), the D.C. Circuit

21  held that multiple convictions for using or carrying a firearm under section 924(c) may not be

22  linked to a single underlying offense.  There, the defendant was convicted of, *inter alia*, a single

23  conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §

24  846 (the conspiracy lasting more than six months) and four violations of 18 U.S.C. § 924(c)(1).

25  The evidence established that at least five firearms had been carried or used on four separate

26  occasions during the conspiracy. *Id.* at 1325.

27       On appeal, Anderson argued that he may only be convicted of one violation of

28  § 924(c)(1) because, although the Government charged him with several separate predicate

37

offenses, all four § 924(c)(1) charges were linked only to the conspiracy charge. *Id.* The *en banc* court agreed, noting:

> Seven of our sister circuits have determined that only one § 924(c)(1) violation can be appended to any single predicate crime. *See United States v. Cappas*, 29 F.3d 1187, 1189 (7th Cir.1994) (citing cases); *United States v. Lindsay*, 985 F.2d 666, 673 (2d Cir.), *cert. denied*, 510 U.S. 832, 114 S.Ct. 103, 126 L.Ed.2d 70 (1993); *United States v. Sims*, 975 F.2d 1225, 1233 (6th Cir. 1992), *cert. denied*, 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995); *United States v. Moore*, 958 F.2d 310, 312 (10th Cir. 1992); *United States v. Hamilton*, 953 F.2d 1344, 1346 (11th Cir. 1992); *United States v. Privette*, 947 F.2d 1259, 1262-63 (5th Cir. 1991), *cert. denied*, 503 U.S. 912, 112 S.Ct. 1279, 117 L.Ed.2d 505 (1992); *United States v. Fontanilla*, 849 F.2d 1257, 1258-59 (9th Cir. 1988). Those courts have relied on two strands of analysis. The Sixth Circuit thought Congress' intent clearly was to limit a § 924(c)(1)'s "unit of prosecution" to the underlying predicate offense. "The purpose of § 924(c)(1) . . . is to target those defendants who chose to involve weapons in an underlying narcotics crime or crime of violence. Consequently, the predicate offense, not the firearm, is the object of § 924(c)(1)." *Taylor*, 13 F.3d at 993-94. The Second Circuit in *Lindsay* believed that at most (at best for the government) the statute was ambiguous as to the appropriate unit of prosecution, and therefore the rule of lenity was to be applied. *Lindsay*, 985 F.2d at 673-76.

The Government successfully avoided the effect of the Ninth Circuit's decisions adopting *Anderson*'s approach—*see*, *e.g.*, *Fontanilla*, 849 F.2d at 1258-59 (recognizing principle that separate § 924(c) sentences must be linked to separate underlying offenses); *United States v. Wills*, 88 F.3d 704, 719 (9th Cir. 1996) ("[E]ach section 924(c)(1) conviction must be based on a separate predicate offense.") (citation omitted))—by improperly charging multiple Hobbs Act mini-conspiracies. The evidence in the record established, however, and the jury found, that there was a single, broad conspiracy to commit multiple Hobbs Act violations as charged in Racketeering Act One of Count One. As a matter of law, therefore, the separate, discrete conspiracies charged in Counts 10, and 13 could not properly serve as predicates for Mr. Luong's multiple § 924(c) sentences. This Court should therefore resentence Mr. Luong on the basis of only one section 924(c) conviction.

////

////

////

38

**CONCLUSION**

For the reasons set forth in his *pro se* motion and *pro se* authorities, and for the reasons set forth above, Mr. Luong aks the Court to grant him habeas relief on Claims I, III, IX, XI, XII, and XIII.

Respectfully submitted,

DATED: November 27, 2013                    COLEMAN & BALOGH LLP

By: ETHAN A. BALOGH
JAY A. NELSON
235 Montgomery Street, Suite 1070
San Francisco, CA 94104

Attorneys for Defendant
JOHN THAT LUONG

.

39

**PROOF OF SERVICE**

I, Ethan A. Balogh, certify that on November 27, 2013, I served all parties in this matter by causing the foregoing pleading to be filed electronically, as set forth by as set forth by Local Rule 5-1.  I declare the foregoing is true and correct under penalty of perjury of the laws of the United States.

Dated: November 27, 2013                    ETHAN A. BALOGH

1