girlfriend/wife soon returned to the bar and after a brief conversation, LUONG asked CS-7 to step outside to LUONG's car for a few minutes.  The DEA/UCA gave CS-7 $9000.00 in official government funds.  CS-7, LUONG and LUONG's girlfriend/wife then departed the restaurant.  The three were surveilled to a blue Toyota bearing California license plate #3KJF747, which they all entered.  According to California DMV, 3KJF747 is registered to Sy LUONG, 8000 Rush River Drive, Apt. 226, Sacramento, California.  CS-7 gave LUONG the $9000 while LUONG's girlfriend watched.  CS-7 got $500 back from LUONG.  CS-7 then exited the vehicle and LUONG and his girlfriend were observed driving away from the area.  As had been established in earlier conversations, the $9000 payment was for 3 ounces of heroin previously "fronted" by LUONG to CS-7.

53.  Cellular telephone records for (916) 203-6688 confirm the April 17 and 18, 1995 telephone calls between LUONG and CS-7. In addition, physical surveillances in Sacramento and San Francisco, and the presence of undercover agents corroborate the details of the transaction.

3) JUNE/JULY 1995 NEGOTIATIONS WITH LUONG FOR ONE HALF UNIT OF HEROIN

54.  The following sequence of consensually monitored calls were made by CS-7 to LUONG for the purpose of negotiating the purchase of 1/2 unit of heroin.  The calls were made by CS-7 from San Francisco, California and at the direction of law enforcement.  A review of telephone records reveal a pattern of pager calls from CS-7 to LUONG's pager (916) 951-1722 and return

34

40364

calls from LUONG using cloned cellular telephone number (916) 204-6889. The most recent series of discussions regarding the purchase of heroin involve LUONG, CS-1 and CS-7.

### a. Telephone Call of June 7, 1995

55. On June 7, 1995, CS-7 placed one telephone call to pager number (916) 951-1722 and entered a call back number. Shortly afterwards, CS-7 received a return call from LUONG. CS-7 recorded the call during which CS-7 and LUONG discussed the purchase of 1/2 unit (350 grams) of heroin by CS-7 from LUONG. At the conclusion of the discussion, LUONG agreed to sell CS-7 1/2 unit of heroin for $28,000.

56. FBI Special Agent Stephen Dupre contacted a representative of Air Touch Cellular One, Sacramento, CA. to determine whether any calls had been made from their service area to the telephone number CS-7 had entered during his pager call to (916) 951-1722 on June 7, 1995. Special Agent Dupre was advised that on June 7, 1995, mobile telephone number (916) 204-6889 was used to contact the telephone number entered by CS-7 during this pager call.

### b. Telephone Call of June 9, 1995

57. On June 9, 1995, CS-7 placed a telephone call to pager number (916) 951-1722 and entered a call back number. CS-7 received a return call from an individual identified by CS-7 as being LUONG. CS-7 consensually recorded the call. CS-7 and LUONG entered into discussions pertaining to the purchase of heroin by CS-7 from LUONG. LUONG told CS-7 that he did not wish to break up a one-unit brick of heroin in order to sell 1/2 unit

35

to CS-7. CS-7 told LUONG that the buyer(s) did not have enough money available to purchase the entire unit brick. CS-7 stated that the buyer would come back in approximately 3 to 4 weeks to purchase the other 1/2 of the unit. LUONG suggested that the buyer(s) put down a $10,000 deposit. CS-7 stated that it was too much, perhaps two to three thousand dollars might be possible. CS-7 told LUONG that if the buyer(s) do not return to purchase the second 1/2 of the unit with the agreed time frame, the deposit would be forfeited.

58. FBI Special Agent Dupre advised that according to Air Touch Cellular One records, on June 9, 1995, mobile telephone number (916) 204-6889 had been used to contact the telephone number entered by CS-7 during his pager call.

### c. Telephone Call of June 12, 1995

59. On June 12, 1995, CS-7 placed a telephone call to pager number (916) 951-1722 and entered a call back number. CS-7 received a return call from LUONG during which CS-7 recorded the call. CS-7 and LUONG entered into negotiations relative to the purchase of heroin by CS-7 from LUONG. LUONG told CS-7 that he would sell 1/2 of a unit brick of heroin for $30,000; however, CS-7 would be required to pay an additional $10,000 which would be considered as a deposit for the other 1/2 of the one-unit brick. CS-7 told LUONG that it would be to 3 to 5 weeks before the buyer(s) would purchase the other 1/2 of the unit brick. LUONG told CS-7 that he (CS-7) would lose the $10,000 deposit if he did not purchase the other 1/2 of the unit brick within the allotted 3 to 5 weeks. LUONG told CS-7 he wanted $60,000 for one

36

unit, not $58,000 as previously quoted.

60.  Special Agent Dupre advised that according to Air Touch Cellular One's records on June 12, 1995, mobile telephone number (916) 204-6889 had been used to contact the telephone number entered by CS-7 during his pager call.

d. <u>Telephone Call of June 13, 1995</u>

61.  On June 13, 1995, CS-7 placed a telephone call to pager number (916) 951-1722 and entered a call back number.  CS-7 received a return call from LUONG during which CS-7 recorded the call.  CS-7 and LUONG continued negotiations for the purchase of heroin by CS-7 from LUONG.  LUONG told CS-7 that he would not sell 1/2 unit of heroin for less than $30,000.  LUONG was also firm on his requirement of payment of $10,000 which would be applied as a deposit for the other 1/2 of the one unit heroin brick.

62.  During this conversation, CS-7 agreed to the terms of purchase as sought by LUONG.  CS-7 agreed to pay $30,000 to LUONG for the purchase of one half unit of heroin and give a $10,000 deposit for the remaining one half unit. CS-7 asked LUONG to give him three ounces of heroin as a guarantee that when the buyer(s) returned for the second one half unit, that LUONG would deliver. LUONG was unwilling to provide the 3 ounces requested by CS-7. LUONG stated that his merchandise was the best available in the market and that he would always have it available.

63.  Following an agreement on the terms of the sale, LUONG then gave CS-7 directions to meet in Sacramento, CA.  LUONG told CS-7 to bring a scale which would be used by LUONG to weigh the

37

40367

heroin to be delivered to CS-7.  LUONG told CS-7 to proceed to a McDonalds near or on Pocket Road in Melville, CA on 6-14-95. Upon his arrival at the McDonalds, CS-7 was told to call LUONG's pager ((916) 951-1722).  LUONG stated that he resided nearby and would contact CS-7 upon receipt of the pager call.

e. <u>Telephone Call of June 14, 1995</u>

64.  On June 14, 1995, LUONG called CS-7 at approximately 7:30 am.  CS-7 did not expect the call and was unprepared to record the conversation.  During this unrecorded call, CS-7 reported to DEA Agents that LUONG told CS-7 that the heroin was not readily available.  LUONG stated that it may be up to 3 days before he could complete the heroin transaction.

f. <u>Telephone Call of June 20, 1995</u>

65.  On June 20, 1995, CS-7 called LUONG to ask when LUONG would have the heroin available, for sure.  CS-7 recorded this call to LUONG.  CS-7 told LUONG that the buyer was upset.  LUONG stated that he would have the heroin possibly on Tuesday (6/27/95).  LUONG indicated during the conversation that his heroin supplier would not do small amounts and no sample of the current product was available to give to CS-7.  LUONG suggested CS-7 attempt to buy heroin from another source such as "HOANG" (LE, Hoang Ai), but CS-7 stated the buyer did not like HOANG's merchandise because it was of inferior quality.  LUONG said he would contact CS-7 when he had the heroin, possibly before Tuesday.

g. <u>Telephone Call of June 23, 1995</u>

66.  On June 23, 1995, CS-1 spoke to LUONG at approximately

38

2:00 am. CS-1 did not expect to talk to LUONG and was not at a location in which a recording would be possible. During this unrecorded conversation, CS-1 asked about the possibility of doing another deal (heroin deal) in the near future. LUONG indicated that it was not convenient to discuss such matters over the phone and for CS-1 to travel to Sacramento to speak with him.

### h. July, 1995 Calls and Meetings With LUONG

67. On July 4, 1995, CS-1 spoke to LUONG following a pager call by Manson QUACH[8] to LUONG. During the conversation, LUONG indicated that he wanted to meet CS-1 in person to discuss any (heroin) deal. LUONG told CS-1 to travel from San Francisco to Sacramento and upon arrival in Sacramento to page him.

68. On July 11, 1995[9], CS-1 and QUACH traveled to Sacramento to meet with LUONG to discuss a heroin transaction. QUACH placed a pager call to (916) 951-1722 and entered a call back number. QUACH was paged to (916) 204-6889. QUACH then placed a call to that number and spoke with LUONG. LUONG told QUACH to remain at his present location and that LUONG would arrive in 15 minutes or so.

69. Surveillance at QUACH's location observed a copper

---

[8]During the July, 1995 negotiations for heroin with LUONG, QUACH (CS-7) did not report any of the following contacts or calls to LUONG to law enforcement. On July 20, 1995, CS-7 reported to Sergeant McKenna that he had heard CS-1 was traveling to New York to pick up some heroin. CS-7 stated he was not involved in the deal at all.

[9]On July 11, 1995, prior to QUACH's (CS-7) trip to Sacramento, Sgt. McKenna specifically asked QUACH if he was engaged in or had knowledge of any drug trafficking during this time period to which QUACH responded in the negative.

39

40369

colored Mercedes bearing California License Number 3MBP571, registered to Ping Sherry CHAN, 8201 White Sands Way, Sacramento, California, stop briefly and QUACH and CS-1 enter the vehicle. The vehicle then left the area containing QUACH, CS-7 and an Asian male. Surveilling Agents identified the driver of the Mercedes to be LUONG. According to the reports from CS-1 and surveilling agents, LUONG conducted countersurveillance measures upon departure from the initial pick-up location.

70. LUONG told CS-1 and QUACH that the cost of one unit would be $60,000 and that QUACH would receive $5-6,000. LUONG said he has to know by tomorrow whether the buyer(s) will be ready to purchase no less than one unit of heroin. LUONG indicated that the heroin deal could be done within the week if CS-1 would travel to New York. CS-1 told LUONG that he would call him the next day. CS-1 identified LUONG as being the driver of the Mercedes in which CS-1 and QUACH were picked up.

71. On July 12, 1995, while in San Francisco, CS-1 called pager number (916) 951-1722 and entered a call back number. CS-1 received a return call from LUONG. The conversation between CS-1 and LUONG was recorded. CS-1 told LUONG that he would not be able to travel to New York this week and asked LUONG how long he would be staying in New York. LUONG stated he would still be able to meet CS-1 next week Thursday in New York, and that he (LUONG) could be reached on his pager (916) 951-1722 from anywhere in the country.

72. On July 17, 1995, CS-1 called pager number (916) 951-1722 and entered a pager number and CS-1's code. CS-1 recieved a

40

40370

page to LUONG's cellular number (916) 204-6889.  The conversation

between CS-1 and LUONG was recorded.  CS-1 asked LUONG if he

would be in New York on Thursday to do the deal.  LUONG told CS-1

that he would be introducing CS-1 to one of his "boys" who would

travel to New York to take care of the deal.  Later that evening,

CS-1 met LUONG at a night club in San Francisco.  CS-1 was

introduced to an unidentified Asian male by LUONG.  LUONG

referred to this individual as "CHEONG JAI".  CS-1 was told that

upon arrival in New York, CS-1 was to page LUONG on pager number

(916) 951-1722 and provide a telephone number at which CS-1 could

be reached.  LUONG would then contact "CHEONG JAI" and his

associate in New York to meet CS-1 and do the deal.  The date for

the deal was set for July 22, 1995.

### 4) ONE UNIT HEROIN PURCHASE ON 7/23/95

#### a. July 21, 1995

73.  On July 21, 1995, CS-1 placed a pager call to (916)

951-1722 and entered a call back number.  Shortly afterward CS-1

received a call back from LUONG.  During the conversation, CS-1

advised that he had arrived in New York and was prepared to go

forth with the heroin purchase previously discussed.  LUONG

stated that his people were already present in New York and he

would call his representative to contact CS-1.  After waiting for

an extended period, CS-1 called LUONG a second time to determine

the nature of the delay.  LUONG stated that he would call his

representative again to contact CS-1.  Following the second

conversation with LUONG, CS-1 received a telephone call from

"CHEONG JAI" (this was the individual introduced to CS-1 on July

41

40371

17, 1995, by LUONG).  "CHEONG JAI" stated that he would contact CS-1 the next day to discuss the deal.  A check of telehphone toll records for LUONG's telephone revealed two calls to CS-1's telephone.

### b. July 22, 1995

74.  On July 22, 1995, CS-1 received a telephone call from "CHEONG JAI" and was invited to meet at a restaurant in Brooklyn, New York.  CS-1 was unable to meet at the appointed time with "CHEONG JAI", and was told that contact would be made the next day.

### c. July 23, 1995

75.  On July 23, 1995, CS-1 contacted "CHEONG JAI" and agreed to meet with him at the same location as was previously discussed.  CS-1 met with "CHEONG JAI" for a short period of time and then was introduced to a second Asian male referred to as "JOE".  "JOE" was noted by surveilling agents to be carrying a bag containing a box.  CS-1, "CHEONG JAI" and "JOE" walked around the area in an attempt to find a location to meet.  All locations appeared to be too crowded.  CS-1 suggested that they just do the transaction quickly.  "JOE" handed the bag to "CHEONG JAI" who in turn handed it on to CS-1.  After receipt of the bag, CS-1 asked "CHEONG JAI" about how payment would be accomplished.  "CHEONG JAI" told CS-1 that he would contact him later with the details. CS-1 departed the area and met up with FBI Special Agents who took custody of the bag and its contents.

76.  While meeting with FBI Special Agents, CS-1 received a call from LUONG.  LUONG asked if CS-1 had received the "stuff"

42

40372

(heroin) and asked about the payment, CS-1 replied that the money was at the hotel and stated that he had previously invited "CHEONG JAI" and "JOE" to follow him to the hotel to receive the money. CS-1 offered to bring the money back to California and personally deliver it to LUONG. LUONG replied that he would send his people over to CS-1's hotel to pick up the money. LUONG told CS-1 that his people would be calling shortly. After hanging up with LUONG, CS-1 received a call from "CHEONG JAI" and provided him with directions to the hotel. "CHEONG JAI" then gave the phone to "JOE" who asked CS-1 if he had gotten rid of the "stuff" to which CS-1 replied in the affirmative. A short time later "CHEONG JAI" and "JOE" were observed arriving at CS-1's location. "JOE" was observed meeting with CS-1 and receiving payment for the heroin. A check of the pen register for telephone number (916) 204-6889 revealed one call to CS-1's telephone during the pertinent time period discussed above.

## D. LUONG'S CELLULAR TELEPHONES/PAGERS

77. As indicated above, LUONG usually carries and frequently uses cellular telephones and pagers. Several of the the cellular phones which LUONG has been utilizing have been found to be cloned, which means that a legitimate subscriber's MIN and ESN have been fraudulently duplicated or subscribed to in nominee names. It was explained to me that a compromised or cloned phone is an unauthorized mobil phone being used in conjunction with a legitimate mobile phone number. The charges for calls made on a clone mobile phone will appear on the bill for the legitimate mobile phone. When the cellular telephone

43

40373

company notices an inordinate increase in the number of calls on a particular account, or when a legitimate customer denies making many of the calls appearing on his or her bill, the cellular telephone companies investigate for fraud and, if they find it, terminate service to that number. Therefore, a clone phone normally can be operated for approximately one month before a bill is issued, the fraud is discovered, and the number is then terminated.

78. To clone a mobile phone, the person would obtain the Electronic Serial Number (ESN) and phone number (MIN) of a legitimate phone. This information is then programmed into the clone phone. There are two ways to obtain the ESN and the MIN of a legitimate phone: (1) by having access to service orders of the mobile phone companies, or (2) by using a scanning device that can read these numbers from cellular phones. In either instance, a degree of expertise and technical knowledge is needed to activate a clone phone.

79. To my knowledge, none of the cellular phones or pagers used by LUONG has been subscribed to in LUONG's name, just as none of the cars he drives are registered in his name. LUONG also frequently uses digital pagers subscribed in nominee names or leased by companies which are known to inform lessees of inquires regarding subscribers information, made by law enforcement.

80. It is apparent through investigation that narcotics traffickers must, out of necessity, utilize telephones in order to conduct their criminal activity. Investigation has also shown

44

that narcotics traffickers seldom have telephones subscribed to in their own names. Your affiant believes that narcotics traffickers, such as LUONG, use this subterfuge to thwart the efforts of law enforcement in identifying them. It is your affiant's belief, based on investigation described herein, that LUONG and a few close associates utilize clone cellular telephones, residential telephones, business telephones, motel telephones, and digital beepers in order to carry out their criminal activities. Your affiant believes that LUONG and his co-conspirators are sophisticated narcotics traffickers due to the fact that LUONG uses clone cellular telephones in conjunction with the use of their digital pagers. LUONG is known to utilize his pager to alert him when to activate the cloned phone which he is using. LUONG also uses telephones subscribed to in another person's name, automobiles registered in another person's name, and is known to carry and use false identification in encounters with law enforcement officials. All of the above described actions taken by LUONG appear to be for the purpose of evading law enforcement scrutiny.

81. Investigation has shown that LUONG frequently changes cellular telephones and pagers in an effort to evade law enforcement surveillance. CS-1, CS-4, CS-6, and CS-7 have advised that LUONG frequently changes cellular phones and pagers. I believe that LUONG used cellular telephone number (713) 857-5462 on February 9-10, 1995. I believe that LUONG used cellular telephone number (916) 296-9703 from February 22 to March 19, 1995. I believe that he then switched to cellular telephone

45

40375

number (916) 203-6680 from April 14 to May 8, 1995. I believe that LUONG is currently using cellular telephone number (916) 204-6889. Similarly, LUONG used pager number (617) 263-9006 from approximately May, 1994 to January, 1995; (800) 505-2905 from approximately July, 1994 to August, 1994; and number (800) 709-8276 from approximately January, 1995 to March, 1995. Your affiant believes LUONG is presently using pager number (916) 951-1722.

82. These conclusions are based upon an analysis of telephone toll records, cellular telephone billing records, pen registers, trap and trace devices, and pager subscriber and billing records. The details of this analysis are provided below.

### 1) LUONGS's Cellular Telephones

#### Mobile Telephone Number (713) 857-5462

83. I believe LUONG used mobile telephone number (713) 857-5462 on February 9-10, 1995. Cellular service for this phone was supplied by Houston Cellular, Houston, Texas. A representative of Houston Cellular advised that the phone was subscribed to in the name Stephan Vestal, Houston, Texas. It appears that the telephone billing contained unauthorized calls in February, 1995. This telephone number was used by LUONG during the negotiation and purchase of 1/2 unit of heroin from LUONG and his associates. During the purchase of 1/2 unit of heroin on February 10, 1995, LUONG utilized this cloned cellular telephone, his home telephone (916) 393-8236, and his pager (800) 709-8276, to facilitate the transaction which is described in section IV(C)(1).

46

Mobile Telephone Number (916) 296-9703

84. I believe LUONG used mobile telephone number (916) 296-9703 for the period beginning February 22, 1995 through March 19, 1995. Cellular service for this phone was supplied by Air Touch Cellular One, Sacramento, CA. A representative of Air Touch Cellular One advised FBI Special Agent Stephen Dupre that the telephone was subscribed to the Fillner Construction Company, Sacramento, CA. Special Agent Dupre was also advised that the telephone had been compromised, i.e. "cloned". Air Touch Cellular One confirmed that they had been notified by the legitimate subscriber to (916) 296-9703 who denied responsibility for the increased cellular phone activity reflected in their March, 1995 billing. Upon customer notification of unauthorized use of the telephone, Air Touch Cellular One terminated service to (916) 296-9703 in late March, 1995.

85. In addition, I learned of LUONG's usage of (916) 296-9703 from CS-1 who advised me in February, 1995 that LUONG could be contacted by calling that number. In subsequent debriefings, CS-7 confirmed that LUONG was using cellular telephone (916) 296-9703. On March 3, 1995, CS-1 spoke to LUONG regarding the price of heroin. LUONG was willing to sell #4 heroin for $72,000 per unit or $36,000 per 1/2 unit. LUONG's cost is about $65,000 per unit from an east coast supplier. LUONG would be leaving the west coast for a one week visit to the east coast. A review of toll records for cellular telephone (916) 296-9703 reveals a call to CS-1's location on March 3, 1995 as reported by CS-1.

86. Telephone toll records were obtained for (916) 296-9703

47

40377

for the period January 24, 1995 through March 23, 1995. I
reviewed the telephone toll records for calls placed from (916)
296-9703 and believe that LUONG was the primary illegal user of
the telephone for the period February 22, 1995 through March 19,
1995. These calls are provided to show the pattern of frequently
called numbers by LUONG, and that he is often contacting numbers
associated with known or suspected narcotics dealers/locations
and individuals with criminal arrest records:

    i.  (617) 825-3528 - had been called 34 times and is
subscribed to Bach Trinh NGUYEN. The NGUYEN residence is a
location known to Boston law enforcement authorities to be the
site of narcotics trafficking.

    ii.  (215) 227-2083 - had been called 3 times and is
subscribed to Qi Dan CHEN. Though the telephone is subscribed to
CHEN, investigation by FBI Philadelphia has determined that the
residence is occupied by Sau Hung YEUNG, a known heroin dealer
who is a close associate of LUONG.

    iii.  (415) 334-8478 - had been called 62 times and is
subscribed to To LOI. To LOI is believed to be the mother of
Xuong Manh QUACH. QUACH was and is still residing at the family
residence.

    iv.  (415) 520-7168 - had been called 19 times and is the
pager used by Manson Xuong QUACH.

    v.  (415) 264-8999 - had been called 34 times and is
subscribed to Goldie LEE. According to LE's probation officer,
LEE is the fiancee to Hoang Ai LE. LE participated with LUONG in
the sale of 1/2 unit of heroin to CS-1 on February 10, 1995. Le

40378

has been arrested in the past for cocaine trafficking.

    vi.  (415) 560-3902 - had been called 35 times and is the pager used by Hoang Ai LE. This is the pager number given by LE to CS-1 during the deal on February 10, 1995.

    vii.  (510) 436-6568 - had been called 30 times and is subscribed to Ly T. TRAN. Though subscribed to TRAN, Oakland Police Department records show that Tony Bao Quoc LY has been associated with this phone number. LY is a close associate of LUONG and Hoang Ai LE. LY has been arrested in the past for receiving stolen property and possession of a firearm.

    viii. (916) 383-2963 - had been called 41 times and is subscribed to Muoi LAM. It is believed that this number is being utilized by Huy Chi LUONG, aka Jimmy. INS records show that LAM, is the mother of Huy Chi LUONG.

    ix.  (917) 918-0717 - had been called 11 times and is subleased to E5 Communications, 200 Center Street, New York, New York. FBI New York investigation of this company has determined that it serves numerous gangs in Chinatown and in the past when served with a subpoena, have provided false subscriber information and notified the actual subscriber of law enforcement interest.

    x. (510) 655-4789 - had been called 28 times and is subscribed to Lien Dinh. Although subscribed to by Dinh, investigation shows that this address is associated with LUONG's associate AH MUOI.

    87.  During the period March 20, 1995 through April 14, 1995, the mobile telephone number used by LUONG was not known.

49

40379

<u>Mobile Telephone Number (916) 203-6688</u>

88. I believe LUONG used mobile telephone number (916) 203-6688 during the period April 14, 1995 through May 8, 1995. Cellular service for this phone was supplied by Air Touch Cellular One, Sacramento, CA. A representative of Air Touch Cellular One advised FBI Special Agent Stephen Dupre that the phone was subscribed to Steve LU, Davis, CA. This telephone number was terminated due to lack of payment, but has since been reconnected by the same subscriber.

89. I learned of LUONG's usage of (916) 203-6688 from CS-1 who advised me on April 18, 1995 that LUONG could be contacted by calling that number. In debriefings, CS-7 provided the same information regarding the use of (916) 203-6688 by LUONG. 90. Telephone toll records were obtained for (916) 203-6688 for the period April 14, 1995 through May 8, 1995. I reviewed the telephone toll records and believe that LUONG was the primary user of the telephone for the period April 15, 1995 through May 6, 1995. During this period, amongst the numerous calls placed, the following calls were made to telephone numbers associated with known or suspected narcotics dealers/locations:

i. (617) 825-3528 - had been called 29 times and is subscribed to Bach Trinh NGUYEN (see above paragraph 86(i)).

ii. (215) 227-2083 - had been called 1 time and is subscribed to Qi Dan CHEN (see above paragraph 86(ii)).

iii. (415) 334-8478 - had been called 4 times and is subscribed to To LOI (see above paragraph 86(iii)).

iv. (415) 546-9710 - had been called 11 times and is

50

40380

subscribed to the Chi-Am Restaurant, San Francisco, CA. The Chi-Am Restaurant is a location frequently patronized by QUACH and QUACH is known to have conducted drug transactions at this location.

v. (510) 436-6568 - had been called 10 times and is subscribed to Ly T. TRAN (see above paragraph 86(vii)).

vi. (916) 383-2963 - had been called 61 times and is subscribed to Muoi LAM (see above paragraph 86(viii)).

vii. (917) 918-0717 - has been called 2 times and is subscribed to by E5 Communications (see above paragraph 86(ix)).

Mobile Telephone Number (916) 204-6889

90. On June 5, 1995, investigation to identify usage of mobile telephone by LUONG determined that he was using telephone number (916) 204-6889. Cellular service for this phone was supplied by Air Touch Cellular One, Sacramento, CA. A representative of Air Touch Cellular One advised FBI Special Agent Stephen Dupre that the telephone was subscribed to by Katie Dam, Sacramento, California.

91. Telephone toll records for (916) 204-6889 were obtained for the period 5-20-95 through 6-20-95. I reviewed the telephone toll records and believe that LUONG was the primary user of the telephone during this period. During this period, amongst the numerous calls placed, the following calls were made to telephone numbers associated with known or suspected narcotics dealers/locations:

i. (617) 825-3528 - had been called 3 times and is subscribed to Bach Trinh NGUYEN (see above paragraph 86(i)).

51

40381

ii.  (415)  334-8478 -  had been called 6 times and is subscribed to To LOI (see above paragraph 86(iii)).

iii. (916) 383-2963 - had been called 5 times and is subscribed to Muoi LAM (see above paragraph 86(viii)).

iv. (917) 918-0717 - has been called 9 times and is subscribed to by E5 Communications (see above paragraph 86(ix)).

92.  Telephone toll records for (916) 204-6889 were obtained for the period 7-7-95 through 7-12-95.  A pen register was placed on this number beginning 7-21-95.  I reviewed the toll and pen register records for this telephone number and believe that LUONG continued to be the primary user of this telephone.  During the periods listed above, the following calls were made to telephone numbers associated with known or suspected narcotics dealers/locations:

i. (415) 333-7503 - had been called 3 times and is subscribed to by Manson QUACH.  QUACH changed his telephone number from (415) 334-8478 on June 27, 1995. (In reference to telephone number (415) 334-8478 see above paragraph 86(iii)).

ii. (917) 918-0717 - had been called 1 time and is subscribed to by E5 Communications (see above paragraph 86(ix)).

iii.  (510) 436-6568 - had been called 3 times and is subscribed to by TRAN Ly T.(see above paragraph 86(vii)).

iv. (510) 655-4789 - had been called 3 times and is subscribed to Lien Dinh (see above paragraph 86(x)).

93.  In addition, during the purchase of one unit (700 gms) of heroin, LUONG utilized the telephone bearing this number to facilitate the sale in New York (see above, paragraph 73).

40382

### 2) LUONGS' PAGERS

94.   I believe LUONG has used the following pagers since early, 1994:

(1) (617) 263-9006, for the period 5/94 to 1/95.

(2) (800) 505-2905, for the period 7/94 to 8/94.

(3) (800) 709-8276, for the period 1/95 to 3/95.

(4) (916) 951-1722, for the period 2/95 to the present.

(a) Pager number (617) 263-9006

Pager number (617) 263-9006 is a Pagenet digital pager, subcontracted to Wings Communication, 620 Washington Street, Boston, MA.  Boston, FBI has advised the affiant that Wings Communication has been responsible for compromising drug investigations in the past through notification to subscribers of law enforcement interest.  In May, 1994, LUONG provided this pager number to CS-4.  CS-6 identified this number as the pager known to be carried by LUONG in Boston.

(b) Pager number (800) 505-2905

95.   Pager number (800) 505-2905 is a Pagenet pager subcontracted to Wings Communication, 620 Washington Street, Boston, MA.   On July, 1994, CS-4 was provided pager number (800) 505-2905 as a contact for LUONG during negotiations for a heroin purchase.  The details of the July 29, 1994 heroin transaction can be found in paragraph 42.

(c) Pager number (800) 709-8276

96.   Pager number (800) 709-8276 is a digital pager.  The subscriber information to this pager is unknown at this time.  In February, 1995, LUONG utilized this pager during the negotiation

and sale of 1/2 unit of heroin to CS-1 and an FBI-UCA.  CS-1 and CS-7 have stated that this pager was being utilized by LUONG during February, 1995.  The details of this heroin transaction and the pager use is located in paragraph 45.

   (d) Pager number (916) 951-1722

 97.  Pager number (916) 951-1722 is a Metrocall digital pager.  The pager is subscribed to in the name Huy Chi LUONG, 6939 Mesa Grande, Sacramento, California, but is known to be carried and utilized by LUONG.  On April 17 and 18, 1995, pager number (916) 951-1722 was utilized by CS-7 to contact LUONG to arrange the payment of $10,500 owed in a drug debt to LUONG.  In addition, from June 7, 1995 to the present, this pager number has been used by LUONG to negotiate the sale of heroin with CS-1 and CS-7.

VI. NEED FOR INTERCEPTION

 98.  The preceding paragraphs which have related the facts of this case, have outlined the investigative techniques that have been used thus far in this investigation.  These investigative techniques have succeeded in establishing probable cause for authorization to intercept wire and electronic communications as requested herein, but fall far short of achieving the following goals of this investigation:

   (i) Identification of cloned cellular telephones being used by LUONG to facilitate narcotics transactions and other violations of Federal law;

   (ii) determination of the manner, scope and extent that the cellular telephone bearing the number (916) 204-6889,

54

40384

and the digital pager bearing numbers (916) 951-1722, are being used by JOHN THAT LUONG to facilitate these offenses;

(iii) the identification of other co-conspirators, aiders and abetters who are acting in concert with the subjects of this application, including the identity of as-yet unidentified sources of heroin;

(iv) the dates, times, and places of heroin deliveries and shipments and payments;

(v) the identification of communication facilities, including residential telephones, pay telephones, other digital pagers, business telephones and/or cellular telephones commonly used by the co-conspirators to facilitate controlled substance distribution activities;

(vi) numeric codes placed in digital pagers by co-conspirators to identify themselves to each other, to identify the quantities of drugs requested for purchase, and/or the prices for illicit drugs;

(vii) the manner in which these individuals acquire and use fraudulently cloned or activated cellular telephones;

(viii) locations where the subjects and co-conspirators are storing narcotics;

(ix) identification of assets being acquired by subjects and co-conspirators through the sale of narcotics; and

(x) the precise nature and scope of the illegal activities. In addition, the goals of this investigation are to intercept communications which are expected to constitute

55

40385

admissible evidence of the commission of the above enumerated offenses and proof beyond a reasonable doubt of the intent of each participant to join the conspiracy and to participate willingly.

(A) USE OF CONFIDENTIAL SOURCES/UNDERCOVER AGENTS

99.   The use of informants and Undercover agents is usually an important part of FBI investigations into the criminal activities, particularly narcotics violations.   But unless an informant has been taken into the complete confidence of the subjects, the informant is unlikely to learn the full scope of the violators' activities.   CS-7 has made direct purchases of heroin from LUONG, but it is apparent that LUONG has never taken CS-7 into his confidence with respect to the identity of LUONG's other customers, the identity of his heroin supplier(s), the location(s) at which LUONG stores his heroin and proceeds, nor the volume of heroin he sells. This description of LUONG coincides with that provided by CS-3, who also never learned of the identity of LUONG's heroin supplier(s). Your affiant notes that CS-7 has a credibility problem and not in a position to attempt to penetrate this organization any further. Although CS-1, CS-2, CS-4, CS-5, and CS-6 have met with LUONG, they have never made contact with any of the other upper-level subjects of this investigation who have acknowledged their involvement in drug sales.

100.   Thus far, attempts that have been made to introduce an undercover agent (UCA) to LUONG or his associates have not been successful.  As explained above, CS-7's attempt to introduce a

56

UCA was met with a flat refusal by LUONG to consider the continuation of negotiations for the purchase of heroin. On one occasion, a UCA was present during the purchase of 1/2 unit of heroin from LUONG and HOANG LE, but the UCA was unable to meet with the principal subjects directly due to their cautious behavior during the transaction.

101. Investigators including your affiant, have attempted to use a number of informants during this investigation. Current information provided by the Confidential Sources indicates that LUONG and his associates are still involved in heroin distribution in several cities throughout the United States, but their information is generally second hand. At the present time, there are no sources known to your affiant, with the exception of CS-7 and CS-3, who have knowledge of the activities of the upper-level members of this conspiracy, and who are participants in criminal activities with these individuals. CS-7's limitations with respect to identifying LUONG's heroin supplier(s) are outlined above. CS-3 is no longer available for to be interviewed. None of the other sources have been able to penetrate this organization to any significant degree, and certainly not enough to develop a significant prosecutable case against the mid or upper level members of this group. This is not surprising in light of the heightened sense of caution on the part of narcotics distributors who are aware that their drug couriers/shipments have been seized by law enforcement.

102. As CS-3 has reported above, LUONG's organization is supported by Vietnamese/Chinese gang members in Boston,

57

Philadelphia, San Francisco, Denver, and Los Angeles. LUONG's
actions have served to create fear on the part of the
Confidential Sources and on the part of would-be sources familiar
with the drug-distribution operation described herein. In
addition, investigating law-enforcement personnel familiar with
this investigation have weighed the information regarding the
LUONG organization in considering efforts to further penetrate
this organization by Sources and undercover agents, and have
concluded that a clear danger to their safety exists. In
addition, the use of Sources, to further penetrate the LUONG
organization would jeopardize other ongoing investigations.

103. In your affiant's experience, it is clearly in the
interest of a violator to reveal as little as necessary to others
with whom he deals about the way he conducts his business, to
protect himself from both law enforcement and from other
criminals who may try to interfere with his activities. LUONG has
clearly demonstrated that he believes in this tactic. Even if the
use of an informant or undercover agent successfully develops
evidence that a person is a violator, it is likely that the
evidence will be based on an isolated illegal transaction or
transactions, and fail to disclose and prove the full scope of
the violator's activities in concert with other persons. By
continuing to follow the present course of action, utilizing the
Confidential Sources and physical surveillance, it is reasonable
to assume that additional evidence may be developed against the
members of this organization. This evidence may be sufficient to
arrest them for conspiracy, but proof sufficient to secure a

40388

conviction would still be lacking. No evidence of the agreement reached between the parties or the details of their operation would exist. It is also conceivable that the identities, and perhaps even the implication of some other coconspirators, might be disclosed during the course of the investigation, although it could not be expected that the full scope of the criminal organization would be obtained thereby.

104. In your affiant's experience as an investigator, from training and conversations with other law enforcement officers, it is also your affiant's belief that the upper level members of this organization, including LUONG's as-yet unidentified heroin suppliers, must, of necessity, deal with several other persons who assist them in the purchasing, transportation, packaging, distribution, financing, and storage of controlled substances. There are, however, no informants, including CS-1, CS-2, CS-3, CS-4, CS-5, CS-6 and CS-7 or undercover agents, who reasonably appear likely to be taken into the complete confidence of the members of this organization regarding the extent of this narcotics operation, and who can provide information which will satisfy the goals of this investigation as outlined in paragraph 98, above.

### (B) TOLL RECORDS/PEN REGISTERS

105. It is your affiant's belief that a review of toll records for the cloned cellular telephones used by LUONG and the residential telephone of LUONG is possible, but the results will only reveal what numbers are dialed. Analysis of toll records only reveals what numbers were called from a specific telephone,

40389

except in the case of local calls made from the residential telephone in which no record exists at all. Toll record analysis does not indicate the identities of the persons using the telephone, the nature of the conversations, nor do they identify the telephones from which incoming calls are placed. Your affiant has attempted a review of numerous telephones commonly used by LUONG and others, but it was not possible to determine which calls were placed by LUONG. In addition, physical surveillance of LUONG confirms that he uses numerous residential, business, cellular, and public telephones to communicate with others, in an apparent effort to thwart efforts by law enforcement to determine with whom he is in contact.

106. Although a pen register has been placed on LUONG's residential telephone, an analysis of these records reveals that LUONG does not appear to utilize this phone, to any great extent, to further his illegal activities. Information from pen registers although of some corroborative value, does not indicate the identities of both parties using the telephones or the nature of their conversations, or the telephone numbers from which incoming calls are placed.

107. In addition, LUONG and his associates are known to utilize their pagers to a great extent in the furtherance of their criminal activities. For example, a pager call will be used to notify LUONG that an incoming call will be placed to the clone telephone and for LUONG to activate it in order to receive the call, or a pager call will be placed to LUONG's pager with a contact number, and LUONG will call back on a convenient

60

40390

telephone and avoid the disclosure of the phone which he is using or his location.

(C) BUY-BUST TECHNIQUE

108. Investigative agents have given consideration to a "buy-bust" scenario involving the subjects of this investigation. Such a scenario would call for the arrest of the subjects immediately following a purchase of narcotics. Ideally, investigating agents would then enlist the subjects' cooperation and attempt to develop a prosecutable case against all of the other members of this conspiracy. However, if the investigating agents pursue this option, there will be no assurances that co-conspirators would, in fact, agree to cooperate with the investigators and therefore, there would be a serious risk of compromising the investigation. In your affiant's experience, this option rarely results in the achievement of the goals as specified herein.

109. Another option that your affiant has considered is to wait until individuals identified as upper-level members of this conspiracy pick up deliveries of heroin and attempt by surveillance to identify the supplier. Even if successful, your affiant believes that such surveillance is subject to failure for a number of reasons. The evidence yielded from such an exchange would be probative only of the supplier's attendance at a meeting to deliver an item. The proof that the supplier knew the contents of the package was a controlled substance would be lacking. Such an operation, while "successful" in obtaining evidence against the supplier, would be unlikely to succeed in

61

yielding admissible evidence sufficient to obtain a conviction of any other participants.

(D) PHYSICAL SURVEILLANCE

110. Narcotics violators typically act in a way designed to conceal the nature of their conduct. As a result, surveillance is only effective to corroborate other indications of illegal conduct or provide leads to further the investigation. By itself, surveillance is not reasonably likely to succeed in developing evidence of substantial illegal narcotics trafficking. Your affiant and other agents of the FBI, as well as other law enforcement agencies, have been conducting physical surveillance of the subjects of this investigation since early in 1994. Philadelphia and Boston FBI have conducted numerous surveillances of LUONG and his associates within those jurisdictions. The surveillances have included the coverage of heroin purchases by Confidential Sources from LUONG, AH MOUI, and their underlings. Surveillances have shown that LUONG is constantly on the lookout for surveillance and employs aggressive countersurveillance techniques.

111. LUONG has demonstrated his ability to elude a surveillance and has shown that he is extremely cautious whenever dealing with those who purchase drugs from him. For example, on February 10, 1995, FBI, CDOJ and OPD officers and agents surveilled the purchase of 1/2 unit of heroin from HOANG LE and LUONG through a broker. LUONG and HOANG LE were extremely cautious in an attempt to insure that their participation in the drug transaction was not discovered. They were observed in two

62

40392

different vehicles when making the delivery of drugs and picking up the money in payment for the drugs. In addition, LUONG and HOANG LE appeared to conduct countersurveillance during the transaction. Also on February 28, 1995, information was received from CS-1 that LUONG was in San Francisco to deliver drugs to an associate. Surveillance was initiated at the location where CS-1 advised that LUONG was located. After the meeting Agents of the FBI and CDOJ attempted to follow LUONG in order to obtain LUONG's identity and place of residence. During the course of the surveillance, the vehicle in which LUONG was travelling was stopped by the California Highway Patrol for exceeding the posted speed limit. The person known to be LUONG provided a false name and stated that he did not carry any type of identification. The vehicle then continued on to the Sacramento city limits, at which time the vehicle containing LUONG executed several evasive moves in an obvious attempt to detect and evade the surveillance. Later that evening, LUONG reported to CS-7 that he believed he was followed from San Francisco. CS-7 has also reported that LUONG will "lay low" if he believes law enforcement is surveilling him, and his normal activities will be curtailed. In addition, LUONG frequents Vietnamese/Chinese businesses and areas which make it extremely difficult for law enforcement to surveil him without detection. For example on April 18, 1995, Sacramento FBI surveilled LUONG prior to an appointed meeting with CS-7 in San Francisco for the purpose of repaying a drug debt. LUONG's wife exited their residence at 8000 Rush River Drive, Sacramento, California and surveyed the parking lot. She was then observed

63

re-entering the building and a short time later exited again with LUONG. The couple was observed travelling to a Chinese restaurant. Surveilling agents attempted to verify the couple's location and immediately noted that their appearance was out of place at this particular location, so much so that when they entered the restaurant, LUONG's wife appeared to point the agents out to LUONG. Soon after this surveillance, LUONG advised CS-7 that he would not be doing "anything" for a while since it appeared that he was being watched by law enforcement. During the meeting between CS-1 and LUONG on July 11, 1995, LUONG was observed cruising through the parking lot to detect surveillance. CS-1 reported that LUONG drove down dead end streets and made U-turns to see if anyone was following him, prior to arriving at the site of the meeting.

112. Based on experience and conversations with other law enforcement agents, your affiant is aware that sophisticated narcotics traffickers are, in general, usually sensitive to the possibility of surveillance and other law enforcement involvement in their activities. Any prolonged or regular surveillance of the movements of the subjects would most likely be noticed, causing the subjects to become more cautious in their illegal activities, or flee to avoid further investigation and prosecution.

### (E) SEARCH WARRANTS

113. At this stage of the investigation, without additional information from electronic and wire surveillance and other sources, the execution of search warrants in this matter could

64

40394

not reasonably be expected to produce incriminating evidence of the full scope of the co-conspirators' narcotics activities, nor would this technique be likely to identify the other co-conspirators involved. Members of this conspiracy have not disclosed the storage location for their contraband to any of the sources described herein, although there have been some indications developed from investigation to date that LUONG may be storing heroin at a location near to his residence. However, the subjects of this investigation are not believed to be holding on to their contraband for an extensive length of time, but rather, negotiate deals between buyer and seller as quickly as possible. Furthermore, such searches at this stage of the investigation would be unlikely to reveal the total scope of the narcotics operation and the identities of the co-conspirators. It is unlikely that all, or even any, of the principals of this organization would be at any one location when a Search Warrant was executed. It is believed that Search Warrants, executed at this time, would be more likely to compromise the investigation by alerting the principals of the investigation and, thereby allow suppliers and other unidentified members of the conspiracy to further insulate themselves from successful detection, and to otherwise frustrate the purposes of this investigation.

(F) USE OF THE GRAND JURY

114. I have met with assistant U.S. Attorneys, Northern District of California, and discussed the possibility of initiating a Federal Grand Jury investigation into the illegal activities of LUONG, and others. I believe that use of a Federal

Grand Jury probably would be of limited utility at this time in achieving the above-stated investigative goals for the following reasons:

(a)  Subjects of the investigation, should they be called to testify, would most likely invoke their Fifth Amendment privileges.  Furthermore, subpoenaing the subjects would alert them to the ongoing Federal investigation, thus presenting a danger to those individuals who have cooperated in this matter;

(b)  It would be unwise to seek Grand Jury immunity for any of the subjects named herein as it might foreclose prosecution of the most culpable persons;

(c)  Grand Jury testimony by the information sources at this time would lead only to a limited prosecution, allowing key members of this organization to go unidentified and unprosecuted. Further, such testimony at this stage of the investigation would fail to identify the methods of operation of this organization, as well as the location of the bulk of assets which coconspirators have undoubtedly accumulated as a result of their activities.

(d) It would be difficult to question witnesses without having detailed information about this organization.

115.  The individuals who have been identified in this conspiracy are believed by your affiant to have been involved in the sale of narcotics and other criminal activities for a long time and would, in the opinion of your affiant, be unlikely to cooperate with law enforcement.  Therefore, a Grand Jury investigation with grants of immunity appears reasonably unlikely

66

40396

to succeed.

(G) INTERVIEWS

116. As discussed above, the subjects of this investigation do not reveal information to people who are not part of their criminal conspiracy. As a result, interviews would not be productive in that only the subjects of this investigation have the information needed by law enforcement authorities. In addition, it appears that members of this conspiracy are careful not to reveal the full extent of their operation to any one individual. Attempts to interview such individuals would only result in their being alerted to the existence of the investigation.

117. For the reasons set out above, it is your affiant's opinion that all normal investigative procedures available to law enforcement in the investigation of these narcotics violators are not reasonably likely to succeed if tried or are too dangerous to employ. It appears reasonable that the next step in this investigation, to aid in achieving the goals as stated in paragraph 98, above, is the interception of wire communications as requested herein. Normal investigative procedures have not and cannot succeed in accomplishing the stated goals.

VII. ESN READER REQUEST

118. As indicated above, LUONG has used both cloned cellular telephones and telephones subscribe to nominee subscribers. He intentionally changes cellular telephones frequently to thwart the type of electronic surveillance requested in this Application. Each time he switches telephones,

67

40397

our investigation is stalled until we can identify through ,

informants, surveillance, pen registers, and cellular telephone

and toll records the telephone number of his new cellular

telephone.  This invariably takes a substantial amount of time

because of the delays in searching telephone company records, the

need to see patterns of calls and pages over a period of days or

weeks, and the partial success of JOHN THAT LUONGs' efforts to

avoid law enforcement surveillance through countersurveillance,

use of multiple telephones and pagers, and avoiding the use of

his true name in contacts with law enforcement and as the

subscriber to these services.

119.  We therefore request authorization pursuant to 18

U.S.C. Section 3123 and the All Writs Act to use an Electronic ,

Serial Number (ESN) reader to assist in identifying the cellular

telephones being used by JOHN THAT LUONG.  An ESN reader captures

data from various cellular telephones being used in a given area.

This data can include the Electronic Serial Number (ESN), the

Mobile Identification Number (MIN) (which is the same as a

telephone number), the "off hook" and "on hook" times, the

telephone numbers dialed from a cellular telephone, and the

telephone numbers of cellular telephones making incoming calls to

a cellular telephone.  Some of the devices that can read

electronic serial numbers can also intercept the conversations

occurring over cellular telephones.  We do not intend to or seek

authorization to intercept conversations with the ESN reader; any

conversations to be intercepted will be based upon the court's

authorization to intercept the wire communications of JOHN THAT

40398

LUONG and others. Through analysis of the data obtained, agents can attempt to identify the cellular telephone(s) being used by JOHN THAT LUONG and the others named above. The use of the ESN reader therefore, is relevant and important to this investigation.

VIII. MINIMIZATION

120. All wire interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code. If any of the named interceptees or any of their identified confederates are determined to be participants in a conversation intercepted on cellular telephone number (916) 204-6889, either through voice identification, physical surveillance or by other means, interception will be suspended immediately, provided the overheard portion of the conversation is not criminal in nature. Even if one or more of the named interceptees or their confederates, when identified, is a participant in a conversation on this telephone, monitoring will be suspended if the conversation is not criminal in nature or otherwise related to the offenses under investigation.

121. It is anticipated that most of the conversations to be intercepted will be spoken in the Vietnamese and Cantonese-Chinese language. Therefore, it is expected that an expert in those languages will be available for translation whenever possible. Pursuant to Title 18, United States Code, Section 2518(5), the following minimization procedures have been established:

a. Unless Vietnamese or Cantonese-Chinese translators

69

40399

are reasonably available to minimize conversations on the spot, all such conversations will be intercepted and recorded in their entireties.

b. In the event the translator is not a federal agent, the translator, whether he be a language trained support employee or under contract to the government, will be under the supervision of a federal agent;

c. Conversations monitored by the translator under the guidance of a federal agent will be minimized by the translator and an English translation of the pertinent criminal conversations will be furnished to the supervising agent.

122. Affiant believes that this procedure, which provides for after-the fact minimization where codes or foreign languages are used by the interceptees and there is no expert reasonably available to translate the conversation, complies with Title 18, United States Code, Section 2518(5) and its provisions for specialized minimization procedures when intercepting foreign language or coded conversations.

X. FINAL MATTERS

PRIOR APPLICATIONS

123. A review conducted of electronic and wire surveillance indices of the FBI and the Drug Enforcement Administration (the "DEA"), on July 7, 1995, reveals no prior applications for a Court order authorizing or approving the interception of wire, oral, or electronic communications involving the persons, facilities, and/or premises specified in this application.

70

40400

## LENGTH OF INTERCEPTION

124. The Application for which this Affidavit is submitted in support thereof seeks authorization to intercept electronic and wire communications for a thirty (30) day period concerning offenses listed previously in paragraph 7, above. For reasons stated in this Affidavit, it is your affiant's belief, based upon experience, that these persons will use and continue to use the cellular telephone number (916) 204-6889 for these purposes. Because of the continuing nature of the above-described offenses, and in order to determine the full scope of the organization under investigation and to achieve the goals of the investigation as specified herein, it is requested that the interception of wire communications not cease when the type of communications described above are first intercepted, but continue until the objectives of this investigation are accomplished, not to exceed a period of thirty (30) days.

EXPENSES

125. Any reasonable expenses necessarily incurred pursuant to a Court Order under Section 2518 (4)(e) of Title 18, United States Code, relating to the technical assistance rendered to the Government by a communications service provider or other persons, will be processed by the FBI for payment by the United States Government, unless the Court should direct otherwise.

## CONCLUSION

126. Wherefore, based upon the facts and circumstances related above and my experience as a Special Agent of the FBI, I believe that Probable Cause exists to permit the issuance of an

71

40401

Order to Intercept Wire Communications, and that Order should not terminate on the first interception that reveals the manner in which JOHN THAT LUONG, TUAN THANH NGUYEN, XUANG MANH QUACH, HUY CHI LUONG, and others as yet unknown conduct their illegal activities, but should continue until objectives of this investigation, as specified in paragraph 98, are accomplished, or for the total period of thirty (30) days, whichever is earlier. It is requested that this thirty (30) day period run from the earlier of the date on which the investigative or law enforcement officer first begins to conduct the interception or ten (10) days from the date of this Order.

_____
CAROL K.O. LEE
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me
this ___1st___ day of __August__

_____
UNITED STATES DISTRICT JUDGE